PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DOROTHY ANIM,

*Petitioner,*

v.

MICHAEL B. MUKASEY, Attorney
General,

*Respondent.*

No. 07-1373

On Petition for Review of an Order
of the Board of Immigration Appeals.

Argued: March 20, 2008

Decided: August 11, 2008

Before MICHAEL and MOTZ, Circuit Judges, and
Irene M. KEELEY, United States District Judge for the
Northern District of West Virginia, sitting by designation.

Petition for review granted; vacated and remanded by published opin-
ion. Judge Michael wrote the opinion, in which Judge Motz and Judge
Keeley joined.

## COUNSEL

**ARGUED:** Kim-Bun Thomas Li, Washington, D.C., for Petitioner.
Jem Colleen Sponzo, Office of Immigration Litigation, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Respondent. **ON BRIEF:** Peter D. Keisler, Assistant Attorney Gen-
eral, Civil Division, M. Jocelyn Lopez Wright, Assistant Director,

Office of Immigration Litigation, Mona Maria Yousif, Civil Division, Office of Immigration Litigation, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C., for Respondent.

## OPINION

MICHAEL, Circuit Judge:

Dorothy Anim, a citizen of Cameroon, petitions for review of the denial of her application for asylum and other relief. As part of her case before the immigration judge (IJ), Anim submitted copies of three convocations (summonses to appear) issued to her by the Cameroon police shortly after she fled the country. The IJ denied Anim's application, relying mainly on a letter authored by a U.S. Department of State official that reported, based on an overseas investigation, that the convocations were fraudulent. The Board of Immigration Appeals (BIA) affirmed the IJ's decision. In her petition for review in this court, Anim raises two claims relating to the overseas fraud investigation as described in the Department of State letter. First, Anim claims that the letter establishes that her right to a confidential asylum application was breached during the course of the overseas investigation, in violation of 8 C.F.R. § 208.6. Second, Anim claims that the IJ's reliance on the letter, which lacks any meaningful indicia of reliability, violated her right to due process. Concluding that Anim's claims are meritorious, we grant the petition for review, vacate the BIA's decision, and remand for further proceedings.

I.

In November 2003 Anim submitted an application for asylum and withholding of removal under 8 U.S.C. § 1158(a)(1) and § 1231(b)(3) and for relief under the Convention Against Torture (CAT), *see* 8 C.F.R. § 208.16(c). In support of her application Anim offered the following evidence, much of it through her own testimony, at the hearing before the IJ on January 30, 2004.

Anim is an Anglophone (English speaking) citizen of Cameroon. Cameroon is ruled by a Francophone (French speaking) regime,

which reportedly discriminates against Anglophone citizens. In 2000, after experiencing employment discrimination at her government job because of her status as an Anglophone, Anim joined the Southern Cameroons National Council (SCNC). SCNC is a non-governmental organization established to represent Anglophones and advocate for secession of Anglophone provinces of Cameroon. Anim's relatives and friends were already SCNC members, and shortly after joining the organization, Anim was elected the publicity secretary of her local branch.

On August 27, 2002, Cameroon's largest opposition political party (the Social Democratic Front), which shares many supporters with SCNC, held a nonviolent demonstration. That evening Anim was stopped by two plainclothes police officers while she was walking to choir practice. When the officers asked Anim for identification, they noticed her SCNC membership card and said, "these are the type of people we are looking for." J.A. 214. The police then arrested her, kicking and pushing her into their van. Anim was detained for five hours and then released on the condition that she would cease any opposition to the ruling party.

On October 29, 2002, Anim attended an SCNC-sponsored independence celebration. After this event the government made mass arrests of SCNC members and supporters. In connection with this roundup, two plainclothes police officers entered the shop where Anim worked part time and arrested her. Anim was detained at a police station for five days. The morning after her arrest, the police beat the soles of her feet for two hours. The police then forced her to stand, interrogated her, and threatened to kill her and her family if she did not cease her involvement with SCNC. Anim was then forced to jump and sing songs praising the Cameroon government. This treatment was repeated over the course of her detention. On the fifth day Anim signed a document promising to end her involvement with SCNC; she was then released with a warning that she would be imprisoned if she resumed participation in SCNC activities.

Two months later, on December 20, 2002, Anim attended a demonstration held by the Human Rights Defense Group, another non-governmental organization. That night, police officers entered Anim's house while she was sleeping and arrested her, her brother, and her

sister. Anim was detained in prison for an indefinite term, and she was beaten each day. After two months, on February 22, 2003, Anim's uncle bribed a police brigade commander to help her escape. When Anim escaped, this police official told her uncle that she would only be safe if she left Cameroon. Anim spent the next ten days in hiding. Following the official's advice, Anim's uncle obtained a Cameroon passport for her, and then, together with the official, took her to the U.S. embassy, where she was issued a visa to enter the United States. On March 3, 2003, after being escorted to the airport by her uncle and the police official, Anim left Cameroon. Anim's sister was later served with three convocations, dated March 10, June 20, and August 11, 2003, ordering Anim to appear at the police station. Anim's sister was also informed that a warrant had been issued for Anim's arrest.

Anim presented several documents in support of her claims. These included her birth certificate, her Cameroon passport, pay stubs from her full-time job in Cameroon, her visa, her SCNC membership card, and copies of the three convocations, served on her sister, ordering Anim to appear at the police station. Anim also presented affidavits and letters from the following: her supervisor (Penn Jean Muluh) at the Cameroon Ministry of Public Health, describing her work, involvement with the SCNC, and imprisonment; her uncle, describing Anim's escape from prison and Cameroon; her parents and two brothers, describing her arrests; the vice chairman of SCNC, describing the group, Anim's involvement, and her detentions; her sister and her brother, mentioning her imprisonment; and her older sister, describing police delivery to her of the convocations and their efforts to execute the arrest warrant naming Anim. Anim's documentary evidence also included reports from the U.S. Department of State, Amnesty International, and the British Home Office, describing political repression and torture in Cameroon.

At her hearing Anim also introduced an affidavit and testimony from Victor T. Nchanji, who was Anim's professor at the School of Assistant Health Technicians in Limbe, Cameroon, from 1986 to 1988. Nchanji testified that he had heard about Anim's persecution. When questioned about the name of the person from whom he had learned this information, Nchanji first gave one name, but after Anim

silently mouthed another name, Nchanji changed his testimony, giving another name.

At the end of the hearing the IJ expressed concerns about Anim's credibility, stemming largely from what the IJ characterized as Anim's "attempt to alter the testimony of a witness." J.A. 252. Nevertheless, the IJ suggested both a forensic evaluation and an overseas investigation into the authenticity of Anim's birth certificate, the convocations, the notarization of the affidavits from Cameroon, and the letter from Anim's supervisor at the Ministry of Public Health. To initiate the investigation, the IJ asked the Department of Homeland Security (DHS) counsel in Anim's case to refer the documents to the Department of State for overseas investigation and to the DHS forensic document laboratory for analysis.[1] *See* 8 C.F.R. §§ 208.6(b), .11. The IJ explained his reason for suggesting an investigation as follows: "The Department of State through the American Consulate is going to attempt to confirm the truthfulness of these documents and they will send an investigative report. And that report will determine whether or not I believe your [Anim's] documents, whether or not I believe your case." J.A. 257. DHS counsel and Anim's counsel orally agreed to the investigation.

Thereafter, on July 20, 2004, DHS counsel received a report of investigation (in letter form) regarding Anim's case from Cynthia Bunton, Director of the Office of Country Reports and Asylum Affairs at the U.S. Department of State in Washington, D.C. (the Bunton letter). The Bunton letter reported the following:

> The U.S. Embassy in Yaounde was queried with regard to the authenticity of documents presented and in connection with verification of the employment of Penn Jean Muluh [Anim's supervisor at the Ministry of Public Health] and Bong A. Divine [the notary].

---

[1]DHS has been responsible for immigration enforcement since 2003. Prior to 2003 this responsibility rested with the Immigration and Naturalization Service (INS) in the Department of Justice. For the sake of clarity, we refer to the agency as DHS throughout this opinion.

> The Foreign Service National (FSN) fraud investigator con-
> ducted the investigation. Neither the investigator nor the
> people interviewed were aware that the questions pertained
> to an asylum claim. The investigator is fluent in English,
> French and the local dialect.

> The following information was ascertained: Mr. Nkembong
> Pius Tassay, Provincial Delegate of National Security for
> the North West Province, said the three convocations did not
> come from any police station in the northwest and were
> therefore forgeries.

J.A. 142. The Bunton letter further reported that an employee of the
Delegation of Public Health had confirmed that a person named Penn
Jean Muluh was employed by that ministry and that a representative
of the Cameroon bar association had confirmed that Bong A. Divine,
the notary administering the oaths for affidavits submitted by Anim,
worked at the law firm indicated on the affidavits. In addition, the
DHS forensic document laboratory completed the forensic evaluation
on May 4, 2005. The report concluded that Anim's birth certificate
was "consistent with genuine Cameroon birth certificates" and that the
laboratory's examination of the remainder of the documents was
inconclusive. J.A. 131. The report noted that there was minor over-
writing on numerals in three documents, including one numeral in the
identification number of one of the convocations. DHS submitted
both the Bunton letter and the forensic report in opposition to Anim's
claim. Anim did not object to the admission of the forensic report, but
she challenged the Bunton letter.

At a December 1, 2004, status hearing, the IJ informed Anim that
she had a right to rebut the Bunton letter's conclusion that the convo-
cations were fraudulent, but noted that she would face criminal prose-
cution if he determined that her testimony was false. At the final
hearing, conducted on July 21, 2005, the IJ again explained the
importance of the document authenticity investigation to the issue of
Anim's credibility: "I believe I've already announced on the record
that if this claim as it is written on paper and the documents are true
and there is no fabrication or false claim, this would be a qualifying
case." J.A. 284.

Anim objected to the admission of the Bunton letter on two grounds: (1) the letter indicated a breach of Anim's confidentiality during the investigation and (2) it violated her due process rights by failing to include sufficient information to establish its reliability. The IJ overruled these objections and admitted the Bunton letter "because the parties [had] agreed to this overseas investigation." J.A. 274. However, after admitting the Bunton letter, the IJ remarked that Anim's objections might influence the weight he accorded the letter. He then acknowledged that he was unable to ascertain whether Anim's confidentiality had been breached because the letter contained insufficient information about how the investigation was conducted. The IJ noted that the convocations had Anim's name on them and that the Bunton letter did not indicate "how those convocations were shown" to any party in Cameroon who evaluated their authenticity. J.A. 284. The IJ noted further that the letter did not explain "how [the convocations] were validated or invalidated," that is, how the issue of authenticity was weighed and determined. *Id.* The IJ then suggested that counsel contact Bunton at the Department of State to seek information about whether a breach of confidentiality occurred. Both parties agreed to this inquiry; Anim noted, however, that the inquiry could only resolve the confidentiality issue, but it would have no bearing on the due process issue. In response the IJ said that he would not allow inquiry into, or an evaluation of, "how [the Department of State] . . . conduct[s] [its fraud] investigations." J.A. 290. Because Anim would maintain her objection to the Bunton letter on due process grounds regardless of the outcome of the inquiry, the IJ refused to allow any inquiry to Bunton on the confidentiality issue, concluding that the inquiry would only delay the proceedings.

On September 23, 2005, the IJ issued his decision denying Anim all relief. The IJ did not decide whether Anim's confidentiality had been breached or whether admission of the Bunton letter violated due process. The IJ recognized Anim's "concerns" with respect to these issues, but remarked that her "concerns are overstated." J.A. 311. However, in light of Anim's arguments, the IJ "accord[ed] diminished weight to the Department of State's findings." *Id.* Anim appealed to the BIA, and the BIA issued a per curium order, adopting the IJ's decision. In addition, the BIA rejected Anim's argument that her confidentiality was breached during the overseas investigation on the ground that "[she] agreed to the . . . investigation." J.A. 359. The BIA

also concluded, without discussion, that "[Amin's] due process rights were [not] violated." J.A. 360. Anim then petitioned this court for review, again raising her breach of confidentiality and due process claims.

## II.

When, as in this instance, the BIA adopts and supplements the IJ's decision, "the factual findings and reasoning contained in both decisions are subject to judicial review." *Niang v. Gonzales*, 492 F.3d 505, 511 n.8 (4th Cir. 2007); *see also Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005) ("Where the BIA adopts the decision of the IJ and merely supplements the IJ's decision . . . we review the decision of the IJ as supplemented by the BIA."). We uphold the agency's decision "unless [it is] manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C). And agency findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* § 1252(b)(4)(B); *see also Haoua v. Gonzales*, 472 F.3d 227, 231 (4th Cir. 2007) (stating that "the BIA's administrative findings of fact [are reviewed] under the substantial evidence rule"). "We also defer to credibility findings that are supported by substantial evidence." *Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004). This deference is broad but not absolute: an IJ "who rejects a witnesses's positive testimony because in his or her judgment it lacks credibility should offer a specific, cogent reason for his [or her] disbelief." *Id.* (quoting *Figeroa v. INS*, 886 F.2d 76, 78 (4th Cir. 1989)).

Anim petitions for review of the BIA's denial of her claims for asylum, withholding of removal, and relief under CAT. The Secretary of Homeland Security or the Attorney General has the discretion to grant asylum to a refugee under 8 U.S.C. § 1158(b). To establish refugee status, an applicant must show that she is "unable or unwilling to return" to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). If she shows that she has suffered past persecution, a presumption arises that she has a current well-founded fear of persecution. *Camara*, 378 F.3d at 367 (citing 8 C.F.R. § 208.13(b)(1)). An applicant can demonstrate past persecution through either her own testimony or independent evidence. *Id.* at 370.

If an adverse credibility determination is made with respect to the applicant's testimony, her independent evidence must still be considered. *Id.* If the applicant cannot show past persecution, she must prove both that she is subjectively afraid of future persecution and that her fear is objectively well founded before she can qualify for asylum. *Id.* at 367.

If an applicant for withholding of removal establishes her claim, "the Attorney General *cannot* remove her to her native country." *Id.* A withholding of removal claim carries a more demanding standard of proof than an asylum claim. *Id.* An applicant for withholding of removal must establish that if she was sent back to her home country, there is a clear probability that her "life or freedom would be threatened . . . because of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see INS v. Stevic*, 467 U.S. 407, 430 (1984). An applicant "who has failed to establish the less stringent 'well-founded fear' standard of proof required for asylum relief is necessarily also unable to establish an entitlement to withholding of removal." *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 449 (4th Cir. 2007).

Finally, to qualify for relief under CAT, an applicant must show that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). "Because there is no subjective component for granting relief under the CAT," the IJ must consider any independent evidence that the applicant would be tortured, even if the IJ rejects the applicant's own testimony as not credible. *Camara*, 378 F.3d at 371.

### III.

Amin first contends that the Department of State overseas investigation in Cameroon violated her right to confidentiality under 8 C.F.R. § 208.6, entitling her to asylum, withholding of removal, and relief under CAT. We agree that Anim has established that the investigation violated § 208.6, and we remand for the agency to determine whether Anim is entitled to asylum or other relief based on the confidentiality violation.

Section 208.6 provides that "[i]nformation contained in or pertaining to any asylum application . . . shall not be disclosed without the

written consent of the applicant." 8 C.F.R. § 208.6(a). As DHS recognizes, the confidentiality regulations are of utmost importance in protecting asylum applicants because the "regulations safeguard information that, if disclosed publicly, could subject the claimant to retaliatory measures by government authorities or non-state actors in the event that the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin." J.A. 33 (U.S. Customs & Immigration Servs. Asylum Div., U.S. Dep't of Homeland Sec., *Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applicants* (2005) [hereinafter *Confidentiality Fact Sheet*]). For these reasons, if an asylum applicant's confidentiality has been breached in violation of § 208.6, the applicant must be given the opportunity to establish a new claim for asylum, withholding of removal, or relief under CAT based on the breach. *See Abdel-Rahman*, 493 F.3d at 454 (citing *Lin v. U.S. Dep't of Justice*, 459 F.3d 255, 267-68 (2d Cir. 2006)). In evaluating this claim, the agency must consider whether the breach subjects the applicant to a new risk of persecution or torture that is independent of her original claim. *Id.* The applicant is entitled to relief for the confidentiality violation only if she succeeds on this new claim. *Id.*

Anim claims that the overseas fraud investigator disclosed the convocations to a Cameroon government official in violation of the regulation. She bases her contention on the text of the Bunton letter, which states: "Mr. Nkembong Pius Tassay, Provincial Delegate of National Security for the North West Province, said the three convocations did not come from any police station in the northwest and were therefore forgeries." J.A. 142. Anim further relies on the letter's statement that "the investigator . . . [was not] aware that the questions pertained to an asylum claim." *Id.* This statement contravenes the DHS's guideline that a fraudulent document report "contain . . . a statement that the Service investigator is aware of the confidentiality provisions found in 8 C.F.R. § 208.6," and it indicates that the investigator did not know that he or she was required by regulation to protect Anim's identity. Memorandum from Bo Cooper, Gen. Counsel, INS, to Jeffrey Weiss, Dir. of Int'l Affairs, INS, Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information 7 (June 21, 2001), *available at* http://judiciary.house.gov/legacy/82238.pdf [hereinafter Cooper Memo]. Anim contends that the letter allows the reasonable inference that the

investigator showed the Cameroon official the convocations containing her name. Anim also contends that the disclosure of her name led to a breach of her confidentiality in violation of § 208.6.

DHS puts forth three arguments in response, each of which we reject. First, DHS argues that Anim's confidentiality was not breached because Anim's lawyer orally agreed to the overseas investigation. The BIA explicitly adopted this argument in reviewing Anim's appeal. An agency's interpretation of a regulation is not entitled to deference where the regulation's meaning is unambiguous. *See Christensen v. Harris County*, 529 U.S. 576, 588 (2000). The plain language of the regulation requires the "*written* consent" of the asylum applicant before any information from her application can be disclosed. 8 C.F.R. § 208.6(a) (emphasis added). Thus, although the BIA accepted oral consent as a valid waiver here, we may not defer to that view in light of the clear language of the regulation. Under the plain terms of the regulation, Anim's verbal agreement to the investigation can not be construed to constitute a waiver of § 206.8. *See Lin*, 459 F.3d at 267.

Second, DHS asserts that Anim's claim of confidentiality breach fails because the Bunton letter does not contain sufficient information to establish that the convocations were shown to the Cameroon government official, thus disclosing her identity. We disagree. The cryptic text of the letter and its failure to satisfy DHS's detailed reporting requirements (established to ensure compliance with the confidentiality regulation) support Anim's position. The letter reports the Cameroon government official's conclusory statement that "the three convocations did not come from any police station in the northwest [province of Cameroon] and were therefore forgeries." J.A. 142. According to the DHS requirements for safeguarding confidentiality, the reporting of this statement should have been accompanied by a specific account of how the inquiry was made to the official and what the inquiry entailed. Cooper Memo 6-7; *see infra* part IV. The Bunton letter fails to provide these details about the inquiry made of the Cameroon official. Nevertheless, the official's unequivocal statement — that the three convocations did not come from a police station in the northwest — implies that the convocations had been shown to the official. In addition, the letter states that the investigator was not told that an asylum application was involved, and the letter fails to certify,

again in violation of DHS requirements, *see* Cooper Memo 7, that the investigator was aware of the confidentiality provisions of § 208.6. The contents of the Bunton letter and its clear failure to adhere to DHS requirements for reporting investigation procedure permit the reasonable inference that the investigator showed the Cameroon official the convocations with Anim's name exposed. With this permissible inference demonstrated, the burden of producing evidence to the contrary shifted to DHS. Specifically, the burden shifted to DHS to produce evidence showing that Anim's name was not revealed to the official. DHS failed entirely to satisfy this burden, and this failure compels the conclusion that Anim's name was disclosed.

Third, DHS argues that even if the convocations with her name revealed were shown to the Cameroon official, Anim's claim fails because she did not establish that the official was explicitly informed that she was seeking asylum in the United States. As DHS concedes, however, explicit disclosure of the fact that the applicant has applied for asylum is not required for a violation of § 208.6. *See* Respondent's Br. 33 (stating that a violation occurs when "'the information disclosed by the government was sufficient to give rise to a reasonable inference that [the alien] had applied for asylum'" (quoting *Lin*, 459 F.3d at 264)). DHS has consistently interpreted § 208.6 to be violated

> when information contained in or pertaining to an asylum application . . . is disclosed to a third party in violation of the regulations, and the unauthorized disclosure is of a nature to allow the third party to link the identity of the applicant to: (1) the fact that the applicant has applied for asylum; (2) specific facts or allegations pertaining to the individual asylum claim contained in an asylum application; or (3) facts or allegations that are sufficient to give rise to a reasonable inference that the applicant has applied for asylum.

J.A. 33 (*Confidentiality Fact Sheet*); *see also* Cooper Memo 3; *Lin*, 459 F.3d at 263. Whether an applicant satisfies this objective test is a matter of law, and our review of the issue is de novo. *See Corovic v. Mukasey*, 519 F.3d 90, 95 (2d Cir. 2008); *Averianova v. Mukasey*, 509 F.3d 890, 899-900 (8th Cir. 2007); *Lin*, 459 F.3d at 264-65.

The disclosure of Anim's unredacted convocations to the Cameroon official would allow the official to reasonably infer that Anim had applied for asylum, thus satisfying the test for a breach of confidentiality. The convocations "were the type of document . . . that evidences events commonly known to form the basis of asylum claims in the United States" — in this case official police documents targeting an individual for political activity in opposition to the government. Cooper Memo 4. The disclosure of this sort of document can "give rise to an especially strong inference that the identified alien is applying for asylum." *Lin*, 459 F.3d at 265 (citing Cooper Memo 4). Thus, the disclosure of the convocations enabled the Cameroon official to link Anim's identity to "facts or allegations that are sufficient to give rise to a reasonable inference that [she] applied for asylum," that is, the fact or allegation that she was targeted by the police for her political activity. J.A. 33 (*Confidentiality Fact Sheet*). Further, the circumstances surrounding the disclosure (the "nature" of the disclosure, *id.*) support this link. The possession of the convocations by an investigator associated with the U.S. Embassy — an investigator attempting to ascertain their authenticity — supports the inference that Anim was in contact with the U.S. government. *See Lin*, 459 F.2d at 265; Cooper Memo 4. Under all of these facts, Anim has satisfied the DHS test for a violation of § 208.6.[2]

Anim has thus established that her right to confidentiality under 8 C.F.R. § 208.6 was violated. Anim next argues that she is entitled to asylum or other relief because she has a new fear of persecution based on the Cameroon government's inference that she applied for asylum. Because the IJ and the BIA did not allow Anim to pursue this relief, we remand. Anim must be given the opportunity on remand to present her new claims for asylum, withholding of removal, and relief under CAT based on the alleged consequences of the breach.[3]

---

[2]A number of options are available for DHS to investigate the authenticity of asylum documents while protecting the applicant's rights under § 208.6. *See Lin*, 459 F.3d at 266-67 (explaining that the investigator can redact information that would identify the applicant, obtain a written waiver from the applicant, or apply to the Attorney General for a waiver of the confidentiality provision, among other options).

[3]As we explain below, the Bunton letter may not be given weight during the consideration of Anim's new claims because it lacks sufficient indicia of reliability to satisfy the requirements of due process. *See infra* part IV. Anim may introduce the convocations to the extent they are relevant.

IV.

Anim also argues that the IJ's consideration of the Bunton letter violated her constitutional right to due process. The IJ's decision to deny relief must therefore be vacated, according to Anim. For the reasons that follow, we agree.

A.

The Federal Rules of Evidence do not apply in immigration proceedings, and evidentiary determinations are limited only by due process considerations. *Alexandrov v. Gonzales*, 442 F.3d 395, 404 (6th Cir. 2006); *see Rusu v. INS*, 296 F.3d 316, 320, 321 n.8 (4th Cir. 2002). To succeed on a due process claim in an asylum or deportation proceeding, the alien must establish two closely linked elements: (1) that a defect in the proceeding rendered it fundamentally unfair and (2) that the defect prejudiced the outcome of the case. *See Rusu*, 296 F.3d at 320-22, 324. These two elements are aimed at the same concern — the fairness of the proceeding. The first element requires consideration of whether, prospectively, a particular defect could undermine a proceeding. When the admission of evidence is challenged, this element requires that "'the evidence is probative and its use is fundamentally fair.'" *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 405 (3d Cir. 2003) (quoting *Bustos-Torres v. INS*, 898 F.2d 1053, 1055 (5th Cir. 1990)). In this context "'fairness is closely related to the reliability and trustworthiness of the evidence.'" *Ezeagwuna*, 325 F.3d at 405 (quoting *Felzcerek v. INS*, 75 F.3d 112, 115 (2d Cir. 1996)). The second element, on the other hand, requires consideration of whether the defect, in retrospect in a specific case, was "'likely to impact the results of the proceedings.'" *Rusu*, 296 F.3d at 320-21 (quoting *Jacinto v. INS*, 208 F.3d 725, 728 (9th Cir. 2000)). Thus, consideration of the challenged evidence would have to prejudice the IJ's final decision in the petitioner's case before she could succeed on her due process claim.

B.

Anim argues that consideration of the Bunton letter was fundamentally unfair. We therefore review the letter to determine whether it contains sufficient indicia of reliability and trustworthiness to support

its use. *See Alexandrov*, 442 F.3d 395 (holding that consideration of an overseas fraud investigation report violated due process because the report was insufficiently reliable); *Ezeagwuna*, 325 F.3d at 405-08 (same); *see also Lin*, 459 F.3d at 269 (holding that an overseas fraud investigation report was insufficiently reliable "to satisfy the substantial evidence requirement"). We conclude that the Bunton letter contains insufficient indicia of reliability and, as a result, its use was fundamentally unfair.

First, the Bunton letter (or report) is comprised entirely of multiple hearsay statements. Although hearsay is admissible in immigration proceedings, "[h]ighly unreliable hearsay might raise due process problems." *Alexandrov*, 442 F.3d at 405 (quoting *Yongo v. INS*, 355 F.3d 27, 31 (1st Cir. 2004)). Multiple hearsay, where the declarant is steps removed from the original speaker, is particularly problematic because the declarant in all likelihood has been unable to evaluate the trustworthiness of the original speaker. *See Ezeagwuna*, 325 F.3d at 406. Because officials of certain foreign governments "have powerful incentives to be less than candid on the subject of their government's persecution of political dissidents," *Lin*, 459 F.3d at 269-70, concerns about a report's reliability are amplified when the "report was prepared with the assistance of someone from the government from which [the applicant] is fleeing," *Alexandrov*, 442 F.3d at 405 n.7 (internal quotation marks omitted).

The Bunton letter is authored by Cynthia Bunton, a Department of State official located in Washington. The letter does not explain how Bunton received the information she relates, nor does the letter disclose the identities of some of the individuals in the chain of communication. At least four individuals were in this chain: Nkembong Pius Tassay, the North West Province, Cameroon, government official; the unnamed foreign service national fraud investigator; unnamed individuals located at the U.S. Embassy in Yaounde, Cameroon; and Cynthia Bunton in Washington. The letter indicates that Bunton did not communicate directly with Tassay (the original declarant), and thus she was unable to evaluate his trustworthiness. She was similarly unlikely to have been able to evaluate the trustworthiness of the intervening hearsay proponents of Tassay's statements. In fact, it is likely that several individuals in this chain were "far removed from the evidence" — Tassay's statement — "sought to be introduced." *Ezeag-*

*wuna*, 325 F.3d at 406. The multiple hearsay is particularly troublesome here because Tassay's statement that the convocations were forgeries has a significant risk of having been improperly influenced by his self-interest as an official of the Cameroon government. Thus, the extended chain of (mostly unidentified) hearsay declarants in the Bunton letter raises doubts about the letter's reliability, especially in light of the original speaker's self-interest.

Second, the Bunton letter provides markedly insufficient information about how the investigation into the authenticity of the convocations was conducted. This missing information is essential for two reasons. "The manner of eliciting [the] information is crucial to [the Bunton letter's] probative value." *Ezeagwuna*, 325 F.3d at 408. Without the details of the investigation, it is impossible for an immigration judge, the BIA, or a court to evaluate the reliability of the letter's conclusions. *See Lin*, 459 F.3d at 270. In addition, documentary evidence — especially evidence that is particularly damning to an applicant's case — should be sufficiently clear and complete to give the applicant an opportunity to meaningfully rebut its allegations. *See Alexandrov*, 442 F.3d at 406. Indeed, DHS recognizes that the content and quality of an investigative report, like the Bunton letter, "can determine the report's admissibility as evidence and, if admitted, the weight the immigation judge will accord to it." Cooper Memo 6. Because of the importance of providing detailed reports, the agency has instructed that a fraud report "must contain[ ] at a minimum" nine categories of information, including "the name and title of the investigator," the investigator's qualifications, "the location(s) of any [investigative] conversations or other searches conducted," "the method used to verify the information," and "the circumstances, content and results of each relevant conversation or search[ ]." *Id.* at 6-7; *see Lin*, 459 F.3d at 270-72.

The Bunton letter does not meet even the minimum standards prescribed by DHS, and it lacks the clarity and content necessary to provide fair or probative evidence in an immigration proceeding. The letter does not reveal the identity of the fraud investigator. It does not contain information about the anonymous investigator's qualifications (other than language ability). And it is silent about the methods that the investigator used and the circumstances of the inquiries that were made. The letter simply reports: "The following information was

ascertained: Mr. Nkembong Pius Tassay, Provincial Delegate of National Security for the North West Province, said the three convocations did not come from any police station in the northwest and were therefore forgeries." J.A. 142. This statement gives us no information about the circumstances or manner in which Tassay was approached or questioned, the basis for his conclusion, or why he was in a position to give a conclusive answer as to whether the convocations are authentic. Furthermore, the letter does not explain whether (or how) the investigator attempted to verify Tassay's conclusions. Nor does the letter explain whether the investigator had reason to believe that Tassay would be trustworthy in rendering his conclusion. In short, the letter's lack of information about the investigator, how the investigation was conducted, and how and why the official reached his forgery conclusion make it practically impossible to assess the letter's reliability.

Finally, the IJ appeared to rely upon the general prestige and competence of the Department of State in determining that the Bunton letter was sufficiently reliable to be considered. When Anim argued that the letter should be excluded because it violated her due process rights, the IJ responded, "I don't think we can presume to impose upon the Department of State's fraud unit on how they do their — conduct their investigations." J.A. 290. General deference to the Department of State cannot substitute for an adequate evaluation of the reliability of a document, especially when the document — as is the case with the Bunton letter — provides practically no information upon which a reliablity determination can be made. *See Ezeagwuna*, 325 F.3d at 407.

Because the Bunton letter is comprised of multiple hearsay and lacks sufficient verifying information, there was no basis for the IJ to determine that the letter was reliable. The letter was not probative and its use was fundamentally unfair to Anim. We therefore hold that the IJ's consideration of the Bunton letter violated Anim's right to a fundamentally fair proceeding, satisfying the first element of a due process violation.

## C.

Anim argues that the improper consideration of the Bunton letter prejudiced the result of her proceeding. Because the IJ's decision to

deny relief turned on his finding that Anim submitted fraudulent doc-
uments, and this finding cannot be sustained without reliance on the
Bunton letter, we agree.

At Anim's initial hearing the IJ expressed serious concern about
her credibility, a concern that was based largely on her interference
with her witness's testimony. The IJ explained, however, that the doc-
uments she submitted would outweigh this concern in his final evalu-
ation of the case, if the documents were verified. The results of the
fraud investigation, he informed Anim, "will determine whether or
not I believe your documents, whether or not I believe your case."
J.A. 257. After the Bunton letter was received, the IJ reiterated that
the fraud investigation would determine the outcome of the case: "I
believe I've already announced on the record that if this claim as it
is written on paper and the documents are true and there is no fabrica-
tion or false claim, this would be a qualifying case." J.A. 284. In his
written opinion the IJ reemphasized his decision to give the docu-
ments controlling weight:

> [S]ome of Respondent's documents appear to be fraudulent,
> further undermining the credibility of her claim. *See* Gov-
> ernment's Exhibits B & C [Bunton letter and forensic
> report]. The presentation of fraudulent documents is *a criti-
> cal factor* in the Court's analysis of the alien's credibility.
> Introduction of fraudulent documents, in the absence of
> explanation, regarding such presentation, creates serious
> doubts regarding the respondent's overall credibility, and
> diminishes the reliability of other evidence.

J.A. 311 (emphasis added) (internal citations omitted).

The IJ ultimately concluded that Anim's testimony that she had
been subjected to past persecution was not credible. As a result of the
adverse credibility finding, the IJ noted that Anim could still prevail
if her documentary evidence supported her claims independently of
her testimony. *See Camara*, 378 F.3d at 369-72. Concluding that the
convocations were fraudulent and that Anim's other documents
describing the possibility of future persecution were "unsubstantiated
and dubious in light of the questionable authenticity" of the convoca-
tions, J.A. 313, the IJ found that Anim was unable to provide suffi-

cient documentary support for her claims. Specifically, in denying Anim's claims for asylum and withholding, the IJ explained:

> [E]ven if [Anim] does subjectively fear returning to Cameroon, she has not provided sufficient evidence to conclude that her fear of country-wide persecution in Cameroon is objectively reasonable.
>
> Indeed, there is no credible, objective evidence in the record which indicates that [Anim] would face even a remote chance of persecution if she were returned to Cameroon. The convocations that purport to show the Cameroonian government is still looking for [Anim] appear to be fraudulent, and none of her other documentary evidence is either probative or credible enough to establish that she has a prospective well-founded fear of persecution on account of her activities with the SCNC.

J.A. 317. The IJ used similar reasoning to support his decision to deny relief under CAT. According to the IJ, Anim "presented no credible evidence to indicate that she would be at risk of torture if she were to return to Cameroon. Moreover, [Anim] has provided no credible evidence to suggest that the Cameroonian government retains an interest in her since she left the country." J.A. 318. We read the IJ's opinion to rely on his finding that Anim's documents were fraudulent, a reading that is based on the IJ's repeated, deliberate statements on the record that the case hinged on the issue of the documents' authenticity.

We therefore consider whether substantial evidence would support the IJ's finding that the documents were fraudulent, with the Bunton letter excluded from consideration. In concluding that Anim submitted fraudulent documentation, the IJ first relied on the Bunton letter. But the Bunton letter cannot be used to support the finding of fraud, as we have indicated. Noting Anim's concerns about the letter (but believing them to be "overstated"), the IJ then made three additional observations that, he said, independently supported his conclusion. J.A. 311. First, he found that the report from the DHS forensic document laboratory "raises serious questions about the authenticity of the convocations based on the overwriting on them." J.A. 312. The foren-

sic report does not support the IJ's interpretation. As DHS concedes, the report explains that the results of the forensic evaluation were inconclusive as to the authenticity of the documents. With respect to the convocations, the report finds only one instance of overwriting on one numeral on one convocation, on that document's handwritten identification number. This simple notation in the report cannot be said to raise "serious questions" about this particular convocation, much less about all of the convocations. The IJ's reliance on the forensic report is thus misplaced.

Second, the IJ (through his own analysis) noted inconsistent methods among the convocations with respect to the handwriting of the numeral "1" and dating of the documents. Significantly, the forensic laboratory, which is trained in detecting signs of fraud, did not find these inconsistencies notable. Furthermore, these minor inconsistencies are likely attributable to different subordinates preparing the convocations for the police commissioner's signature. The IJ's independent examination of the convocations thus provides little support for his finding of fraud.

Finally, the IJ found that "the information on the convocations is inconsistent with information in an affidavit submitted by [Anim's] sister, who was the alleged recipient of the convocations." J.A. 312. Anim's sister reported that the convocations were served on her in March, June, and August of 2003, the same months indicated on the convocations. She further correctly reported that the March convocation summoned Anim to appear on March 12 and that the June convocation was served on June 20, the day the convocation was dated. However, two of the exact dates reported by Anim's sister did not match the dates written on the convocations (she reported March 20 and August 1, while the convocations were dated March 10 and August 11). A possible mistake of a few days in the sister's recall of such a minor detail, especially given the correct details she did report, cannot provide substantial evidence that the convocations are fraudulent. Thus, in the absence of the Bunton letter, the IJ's conclusion that the convocations are fraudulent is not supported by substantial evidence.

We turn finally to whether the IJ's finding of fraud impacted the proceedings in a way that prejudice resulted. As the IJ recognized, for

Anim to succeed in her claims for asylum or withholding, she was required to show a well-founded fear of future persecution. Anim could carry her burden by either (1) proving that she was subjected to past persecution, thereby establishing a presumption of future persecution or (2) proving directly that she subjectively fears future persecution and that her fear is objectively reasonable. *See Camara*, 378 F.3d at 367. Because "the subjective element cannot generally be proved other than through the applicant's testimony," an adverse credibility finding regarding testimony about fear of future persecution will likely defeat a claim unless the applicant introduces independent evidence of past persecution. *Id.* at 369.

Here, the IJ found that Anim's testimony regarding her past persecution was not credible. This decision was based on several reasons (including interference with a witness's testimony) in addition to the finding that the convocations were fraudulent. We will assume that the credibility determination was supported by substantial evidence. Nonetheless, it is likely that the IJ would have reached a different outcome if he had given due consideration to the independent evidence that he discounted because of the finding of fraud.

In evaluating Anim's claims for asylum and withholding, the IJ did not decide whether Anim's testimony about her future fear of persecution was credible, stating "even if [Anim] does subjectively fear returning to Cameroon, she has not provided sufficient evidence to conclude that her fear of country-wide persecution in Cameroon is objectively reasonable." J.A. 317. If the IJ found that Anim credibly testified to her subjective fear of future persecution, Anim only would be required to show that this fear was objectively reasonable. At the hearing, the IJ rejected Anim's evidence of future persecution due to his finding of document fraud. Properly considered, however, the rejected evidence could provide the necessary objective support. The convocations, summoning Anim because of her escape from imprisonment for her political activities, provide objective evidence that Anim would face persecution upon her return to Cameroon. This evidence that she could face persecution is corroborated by the letters, affidavits, and reports that Anim submitted, but that the IJ discounted in light of the finding of fraud.

On the other hand, if the IJ ultimately found that Anim's testimony about her fear was not credible, Anim could prove her claim through

independent evidence of past persecution, which would establish a presumption of future persecution without credible testimony from Anim. Here too the IJ rejected the evidence offered by Anim because of his finding of fraud. Properly considered, however, the convocations, which were issued as the result of Anim's escape from her previous imprisonment and torture for her political activities, along with the sworn accounts of her family members and associates, could provide sufficient independent evidence of past persecution to support her claims for asylum or withholding.

In addition, "[b]ecause there is no subjective component for granting relief under the CAT, the adverse credibility determination . . . would not necessarily defeat [Anim's] CAT claim." *Camara*, 378 F.3d at 371. Under CAT Anim was required to present evidence that it was "more likely than not that . . . she would be tortured" if removed to Cameroon. 8 C.F.R. § 208.16(c)(2). The IJ rejected Anim's claim under CAT because he concluded — again, based on his finding of fraud — that she had "provided no credible evidence to suggest that the Cameroonian government retains an interest in [Anim] since she left the country." J.A. 318. As a result, Anim was unable to demonstrate that she risked torture upon her return. The IJ's denial of CAT relief cannot stand because the convocations and other discounted documents could provide objective evidence that the Cameroon government retains an interest in Anim and that she could face torture if she was forced to return to Cameroon.

Because the IJ repeatedly explained that his denial of relief turned on his finding that Anim's documents were not authentic, we conclude that improper consideration of the Bunton letter and the resulting finding of fraud prejudiced the outcome in this case. Anim has thus demonstrated a violation of her right to due process. We therefore vacate the decision and remand for reconsideration of Anim's original claims for asylum, withholding of removal, and relief under CAT. On remand, appropriate consideration must be given to Anim's independent documentary evidence, including the convocations. It will, of course, be left to the IJ to weigh the evidence and make the ultimate factual determinations.[4]

---

[4]Even though we conclude that a remand is required, we acknowledge the IJ's deliberate and conscientious consideration of Anim's case.

## V.

We grant Anim's petition for review and vacate the BIA's decision. Anim has carried her burden of showing that her confidentiality was breached during the overseas investigation, in violation of 8 C.F.R. § 208.6. We remand for a determination as to whether Anim can establish new claims as the result of the violation of her right to confidentiality. In addition, the use of the Bunton letter, which provided the basis for the IJ's determination that Anim's documents were fraudulent, violated Anim's right to due process. Because the IJ's finding of fraud was pivotal to his decision to deny Anim relief on her original claims, we also remand for the reconsideration of Anim's original claims.

*PETITION FOR REVIEW GRANTED;*
*VACATED AND REMANDED*