PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CORETHA AMUZANG TASSI,

*Petitioner,*

v.

No. 10-2194

ERIC H. HOLDER, JR.,

*Respondent.*

On Petition for Review of an
Order of the Board of Immigration Appeals.

Argued: September 21, 2011

Decided: November 7, 2011

Before NIEMEYER and KING, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Petition for review granted; vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Niemeyer and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED:** Danielle L. C. Beach-Oswald, BEACH-OSWALD IMMIGRATION LAW ASSOCIATES, PC, Washington, D.C., for Petitioner. Franklin M. Johnson, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Tony West, Assistant

Attorney General, Civil Division, Douglas E. Ginsburg, Assistant Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

**OPINION**

KING, Circuit Judge:

Coretha Amuzang Tassi, a native and citizen of the Republic of Cameroon, petitions for review of the final order of the Board of Immigration Appeals (the "BIA") affirming the denial of her claims for asylum, withholding of removal, and protection under the United Nations Convention Against Torture (the "CAT"). As explained below, we grant the petition for review, vacate the BIA's order, and remand for further proceedings.

I.

On February 22, 2002, Tassi entered the United States on a thirty-day visitor visa. She overstayed her visa and filed an asylum application on March 28, 2002. On May 29, 2002, the Immigration and Naturalization Service (the "INS") referred her application to an immigration judge (the "IJ").[1] At the IJ's initial hearing on June 25, 2002, Tassi conceded removability but sought relief through asylum, withholding of removal, and the CAT (collectively, the "asylum application"). Evidentiary hearings concerning the asylum application were held before the IJ on May 17, 2004, June 12, 2006, September 6, 2006, and June 23, 2008. The evidence submitted with the asylum application and adduced at the IJ hearings, as well as the find-

---

[1] Pursuant to the Homeland Security Act of 2002, the INS ceased to exist as part of the Department of Justice on March 1, 2003. *See* 6 U.S.C. § 251. The enforcement functions of the INS have been transferred to the Department of Homeland Security.

ings and conclusions of the IJ and the BIA, are summarized below.

## A.

Tassi, an Anglophone citizen of the Francophone-dominant Republic of Cameroon (hereinafter "Cameroon"), became a student at the University of Buea in the Anglophone South West Province of Cameroon in 1994, and she was a graduate student there before entering the United States in 2002.[2] As editor and assistant publisher of the University's student newspaper, Tassi circulated information about the Southern Cameroon independence movement and featured articles on Anglophone marginalization. Tassi testified that, to support the Southern Cameroon independence movement, she joined the Southern Cameroon(s) National Council ("SCNC") in 1994 and the Southern Cameroon(s) Youth League ("SCYL") in 1996, serving as the public relations officer for SCYL.

According to Tassi and her husband, Reeves Ade, Tassi was arrested in Cameroon three times because of her involvement with the student newspaper and her affiliations with

---

[2]According to the evidence, the German "Kamerun Protectore" was partitioned between France and Great Britain following World War I. *See* J.A. 442. The partitioning "laid the foundation for the construction of Anglophone [English speaking] and Francophone [French speaking] identities in the territory and the populations of each sphere came to see themselves as a distinct community, defined by differences in language and inherited colonial traditions of education, law, public administration and worldview." *Id.* In the early 1960s, British "Northern Cameroons" integrated with bordering Nigeria, while British "Southern Cameroons" reunified with Francophone Cameroon to form the "Republic of Cameroon." *Id.* at 442-43. Anglophones in the unified Cameroon constituted a minority that was marginalized politically and economically. *See id.* at 443-44. Thereafter, "[t]o reduce the danger of any future united Anglophone action" in support of independence for Southern Cameroons, the former Southern Cameroons was divided into the "South West Province" and the "North West Province." *Id.* at 443. (Citations herein to "J.A.___" refer to the contents of the Joint Appendix filed by the parties in this matter.)

SCNC and SCYL. First, on January 15, 1997, she was arrested for publishing an edition of the newspaper that was critical of school authorities for expelling the student union president. On that occasion, four men in plain clothes took Tassi to a "brigade" in Buea where she was stripped to her underwear, beaten all over her body, and locked in a cell.[3] Tassi was released on January 18, 1997, after her lawyer, Sam Ekontang Elad, and her uncle intervened, and after students had threatened to boycott exams. Tassi was arrested a second time on April 7, 1997, because of her leadership position in SCYL. Two gendarmes took her to the brigade in Buea where she was beaten and interrogated for five hours, and she was released only after signing a document denouncing her SCYL membership.

Tassi's third arrest occurred on January 8, 2000, while she was attending a demonstration in the city of Limbe celebrating the announced independence of Southern Cameroon. Tassi was initially detained at a police station in Limbe, then transferred to the brigade in Buea where she was again beaten and locked in a cell for twelve days. Tassi was released once more with the help of lawyer Elad and her uncle, after signing a statement agreeing to report to the brigade every other Monday. Tassi's "Release Order" from the "Central Prison Buea" is dated January 20, 2000. *See* J.A. 619. According to Reeves Ade and Tassi's mother-in-law, Anastasia Ade, when Tassi was released, she had a gash on her left check and bruises on her body, so they rushed her to the hospital. Upon her admission to the hospital, Tassi's doctors completed a "Medico-Legal Certificate" on government letterhead, also dated Janu-

---

[3]According to a report of the Medical Foundation for the Care of Victims of Torture, the "Anti-gang Brigade" and the "gendarmerie," the paramilitary police (singular member, "gendarme"), are security forces whose members tend to "dress in plain clothes, are heavily armed and act outside the law with total impunity: detaining, torturing and executing people suspected of highway robbery and sometimes to settle personal scores." J.A. 726-27. They also operate "unnamed" police cells, prisons and "gendarmerie bases" in Buea, among other places. *Id.* at 737.

ary 20, 2000, stating that her injuries "presumed to be due to police battery." *Id.* at 606. Tassi testified that she remained in the hospital for three days. Reeves confirmed that Tassi thereafter reported to the brigade for a few Mondays, but ceased the practice because she was not requested to do anything and sometimes was told simply to return home.

In October 2001, while Tassi and Reeves were attending a celebration for independence in Buea, they received a tip from a policeman that Tassi's name was on a list of persons who were to be arrested that very day. They promptly fled to the Chumba village in Bamenda, the capital of the North West Province, where Tassi remained in hiding for several months, until February 2002. Tassi's father then made arrangements with a family friend named Chief Fomuki to get Tassi out of Cameroon. Chief Fomuki, who was travelling to the United States on business, agreed that Tassi could accompany him, posing as his wife. They obtained a visa and passport for Tassi at the American embassy, listing her surname as Fomuki. Reeves testified that, in early March 2002, after Tassi had left for the United States, the Cameroonian authorities came to their home looking for Tassi and served him with a "Convocation" ordering Tassi to report at the "Gendarmerie." J.A. 639. Reeves explained that the police also searched the house, closed his stores, and threatened to put him in jail. Consequently, Reeves also fled to the United States, using a fake passport, and, according to Tassi, arrived in September 2002.

In addition to her own testimony and that of Reeves and Anastasia Ade, Tassi presented the evidence of Justice Aloysius Mbu, whom the IJ accepted as an expert on "human rights and politics in Cameroon." *See* J.A. 144.[4] Justice Mbu

---

[4]The IJ refers to Tassi's expert as "Chief Mbu." We refer to him as "Justice Mbu," as do the parties in their briefs in this Court. Mbu's curriculum vitae reflects that he had received four magistrate court appointments in Cameroon and that he also served, inter alia, as senior state counsel to a court called the High Court, and as advocate-general to another court called the Court of Appeal. The curriculum vitae details Justice Mbu's publications on various topics, including human rights. *See* J.A. 1181-85.

had reviewed Tassi's asylum application and affidavit, and explained that active members of SCNC and SCYL, like Tassi, are routinely persecuted in Cameroon. Mbu elaborated on the daily arrests and disappearances in Cameroon of SCNC and SCYL members. He stated that he believed Tassi to be credible, especially since he had confirmed her story with her Cameroonian attorney, Elad. According to Justice Mbu, Tassi remained active in SCNC in the United States, and would therefore be arrested, detained, or even killed if she were to return to Cameroon.

Tassi also submitted several documents in support of her asylum application, including: (1) a letter from Ebenezer Derek Mbongo Akwanga, Jr., founder and national chairman of SCYL, explaining that Tassi was "extremely active" in SCYL, that she had been "blacklisted" by the Cameroonian authorities because of her political involvement and ties to him, and that her life would thus be in danger if she returned to Cameroon, *see* J.A. 394-98; (2) a letter from Charles Mbide Kude, SCNC's assistant secretary general, describing Tassi as an "activist of the SCNC" who had "contributed enormously to the struggle for self determination of the Southern Cameroons as an independent country" and had "suffered serious torture" in support of such efforts, *id.* at 625-26; (3) an affidavit of John Fomunyoh, chairman of the "Southern Cameroons Restoration Movement," specifying that Tassi is an "active member of the Southern Cameroons Peoples Conference in the United States" and would be arrested again if she were to return to Cameroon, *id.* at 1220-21; (4) a letter from lawyer Sam Elad, Tassi's attorney and the "pioneer chairman" of SCNC, detailing Tassi's involvement in SCNC and SCYL and confirming her arrests, *id.* at 622-23; (5) a handwritten January 2003 letter from a clinical psychologist, Dr. Jean Francis Ladkin, acknowledging Tassi's claims of past persecution and her self-reported symptoms, and concluding that Tassi's "psychological state strongly points to a very severe state of Posttraumatic Stress Disorder" ("PTSD"), *id.* at 628-30; and (6) a September 2005 article published in *The Guard-*

*ian Post* of Yaounde, Cameroon, relating that the police in Cameroon were looking for persons connected with SCNC, including "Tassi Coretha, a fire-brand activist . . . who was arrested and reportedly tortured on several occasions," and who was "suspect[ed]" of having "sneaked back" into the country to "foment trouble," *id.* at 582-83. Additionally, Tassi submitted other supporting documents to the IJ, including marriage and birth certificates; a Cameroonian passport; membership cards for SCNC, SCYL, and the Association of Student Journalists; an arrest warrant dated January 7, 2000; the Release Order of January 20, 2000; the Medico-Legal Certificate, also dated January 20, 2000; the Convocation dated March 12, 2002; the 2000 and 2004 State Department country reports on human rights practices in Cameroon; plus other reports and articles on Cameroon.

## B.

By decision of January 2, 2009 (the "IJ Decision"), the IJ denied the asylum application, explaining that Tassi's "testimony contained numerous internal inconsistencies that cast doubt on her overall credibility." IJ Decision 15.[5] The IJ Decision emphasized six such inconsistencies:

- Tassi testified that SCYL was a part of SCNC. When shown a printout of SCYL's website stating that SCYL was not part of SCNC, however, Tassi stated that SCYL was created separately. The IJ found this inconsistency went to the "heart" of Tassi's claims since she had supposedly served as SCYL's public relations officer and faced persecution, in part, due to her involvement with SCYL;[6]

---

[5]The IJ Decision is found at J.A. 48-69.

[6]Under the legal standard applicable in these proceedings, minor discrepancies, inconsistencies, or omissions that do not go "to the heart" of

- Tassi testified that she was a student in Cameroon, but her marriage certificate listed her occupation as "Business." The IJ found Tassi's explanation that the certificate either refers to her husband Reeves Ade's occupation or to Tassi's part-time business ("bought and sold stuff") to be unconvincing;

- Tassi testified that Chief Fomuki told the American embassy that they were travelling to the United States to visit relatives; however, her visa application indicates that the purpose of her visit was to sell clothing to Africans and African Americans and listed her occupation as "Business." Tassi's explanation was that "nothing on the application was real" and that the information was provided simply to obtain the visa;

- Tassi testified that the surname Fomuki was added to her name on her passport and visa application to disguise her identity. The IJ found it "implausible" that a person fearing detection "would do so little to disguise her identity on travel documents";

- When asked if she had any relatives in the United States, Tassi initially identified only her brother, and not her mother who had also applied for asy-

___

an applicant's claims are not necessarily sufficient to support an adverse credibility determination. *See Dankam v. Gonzales*, 495 F.3d 113, 122 (4th Cir. 2007). That standard was modified by the REAL ID Act of 2005, which now authorizes an IJ to base credibility determinations on any inconsistency "without regard to whether [it] goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). The Real ID Act does not apply in these proceedings, however, because Tassi's asylum application was filed prior to the Act's effective date. *See Marynenka v. Holder*, 592 F.3d 594, 600 n* (4th Cir. 2010).

lum. The IJ found Tassi's explanation that it "did not occur to her" to mention her mother to be unconvincing, particularly since Tassi was scheduled to serve as a witness at her mother's asylum hearing. Although the IJ observed that "this error does not go the heart of [Tassi's] claim," the IJ nevertheless found Tassi's initial failure to mention her mother to be "significant in assessing [Tassi's] overall credibility"; and

- Tassi initially testified that Reeves Ade did not come to the United States until 2002 but subsequently acknowledged that he had been to the United States in the 1980s. Tassi also admitted that Reeves was in the United States between 2000 and 2002 and returned to Cameroon on two or three occasions. The IJ found these inconsistencies "raise the issue of whether [Tassi's] true motive in coming to the United States was to reunite with her husband."

*See* IJ Decision 17-19.

Furthermore, the IJ Decision identified ten concerns with Tassi's documentary evidence:

- The January 7, 2000 arrest warrant contained several blank spaces for dates after which the year 2001 is preprinted. Tassi was "unable to explain why a document issued in 2000 would reference the year 2001." Furthermore, the arrest warrant was not authenticated pursuant to 8 C.F.R. § 287.6 (establishing procedures in immigration proceedings for authenticating, inter alia, official records of foreign countries);

- Two dates on the March 12, 2002 Convocation had possibly been changed from 2001 to 2002.

Tassi offered no explanation for such possible alterations;

- The January 20, 2000 Release Order was not authenticated pursuant to 8 C.F.R. § 287.6, and there was no alternative form of authentication;

- The January 20, 2000 Medico-Legal Certificate was not authenticated pursuant to 8 C.F.R. § 287.6, and there was no alternative form of authentication. Furthermore, the Certificate was printed on government letterhead and reflects that Tassi's injuries were caused by the police. The IJ characterized this recitation as "highly unusual," in that Tassi was treated at a government hospital. The Certificate also does not confirm that Tassi was in the hospital for three days;

- Akwanga's letter discusses the dangers posed to Tassi in Cameroon but fails to mention her three arrests or other difficulties. Fomunyoh's affidavit also fails to mention Tassi's past arrests;

- Elad's letter describes Tassi's arrests but does not identify the source of that information. Nor does Elad's letter explain how he learned the details of a search of Tassi's home where policemen supposedly took documents relating to SCNC and SCYL;

- Kude's letter similarly indicates that Tassi was arrested but does not disclose the source of that information;

- Dr. Ladkin's report was unsigned, and he was not available for cross-examination. Moreover, the report mentions only Tassi's self-reported PTSD symptoms, does not state that tests were con-

ducted, and there is no closing statement, thereby suggesting the report is incomplete;

- According to the IJ, the September 2005 newspaper article states that "the police in Yaounde are seeking Tassi Coretha, who they believe has 'sneaked back into town to foment trouble.'" Tassi testified otherwise, however, confirming she had not returned to Cameroon since she left in 2002; and

- Tassi's SCYL membership cards bear the title "Southern Cameroon Youth League." The IJ found that the name of the organization is correctly spelled in the plural, that is, "Southern Cameroons Youth League." Tassi, who had been the public relations officer for SCYL, "provided no explanation for this discrepancy."

*See* IJ Decision 15-17.

The IJ Decision gave "no weight" to Reeves Ade's testimony due to inconsistencies therein about when he purportedly entered and left the United States. *See* IJ Decision 18. The IJ observed that Reeves "initially testified that he entered the United States in September 2002, but Reeves later admitted that he had been [in the United States] on numerous occasions since the 1980s." *Id.* Although Reeves denied living in the United States continuously since November 1986, his "Form I-485 Application . . . states that he has continuously resided in the United States since November 1981." *Id.* The IJ also gave little or no weight to the testimony of Anastasia Ade, Tassi's mother-in-law, finding it to be "self-serving" and otherwise failing to overcome the problems with Tassi's testimony. *Id.* at 19. Notably, even though the IJ "appreciate[d]" Justice Mbu's expert testimony, she gave his evidence virtually no weight because Mbu lacked any firsthand knowledge of Tassi's alleged past persecution in Cameroon. *Id.*

## C.

On January 2, 2009, Tassi appealed the IJ Decision to the BIA, seeking appellate relief through the administrative process. By its September 24, 2010 order (the "BIA Order"), the BIA adopted and affirmed the IJ Decision.[7] The BIA concluded that the IJ's adverse credibility findings were not clearly erroneous and were supported by specific and cogent reasons. The BIA discussed a few of the inconsistencies that the IJ deemed significant. In rejecting Tassi's argument that apparent errors on certain of her Cameroonian documents did not justify the IJ's discrediting of the balance of her documentary evidence, the BIA explained that, "where there is *prima facie* evidence that a document may have been forged, [the IJ] may reasonably rely on that as material negative evidence regarding a claim; the fact that other evidence does not appear to be *prima facie* forged does not compel a conclusion that all documents are genuine." BIA Order 2.

The BIA also rejected Tassi's contentions that the occupation listed on her visa application was immaterial and that the IJ had no reason to find implausible Tassi's explanation that she had altered her surname as a disguise when fleeing Cameroon. The BIA concluded that the IJ's "assessment that these implausibilities tended to show that [Tassi] is not credible is a permissible view of the evidence [and that Tassi's] other arguments regarding other discrepancies and inconsistencies merely provide an alternative view of the evidence but do not show clear error." BIA Order 2.

Finally, the BIA confronted Tassi's assertion that none of the discrepancies identified by the IJ were central to her claims. The BIA again disagreed, observing that discrepancies regarding the SCYL membership card, the affidavits lacking personal knowledge of Tassi's past persecution, and Tassi's motive for travelling to the United States were "legitimate

---

[7]The BIA Order is found at J.A. 3-5.

bases on which to make an adverse credibility finding because they are neither trivial nor unrelated to the core of [her] asylum claim." BIA Order 2. The BIA further determined that Tassi had not shown that the IJ committed clear error in doubting Reeves Ade's credibility. Additionally, the BIA ruled that Tassi was unable to demonstrate that the IJ failed to consider her other evidence, since the IJ had made an "assessment of many relevant documents" and was "not required to address in detail every aspect of a case." *Id.* at 2-3. Therefore, the BIA Order dismissed Tassi's appeal from the IJ Decision. Tassi has filed a timely petition for review in this Court, and we possess jurisdiction pursuant to 8 U.S.C. § 1252.

## II.

Where, as here, a BIA decision has adopted and supplemented an IJ decision, we are obliged to review both rulings. *See Jian Tao Lin v. Holder*, 611 F.3d 228, 235 (4th Cir. 2010). In so doing, we are bound to uphold the BIA's determinations unless they are manifestly contrary to the law and an abuse of discretion, and we must treat findings of fact as conclusive unless the evidence was such that any reasonable adjudicator would have been compelled to a contrary view. *See Lizama v. Holder*, 629 F.3d 440, 444 (4th Cir. 2011). The BIA may be held to have abused its discretion if it failed to offer a reasoned explanation for its decision, or if it distorted or disregarded important aspects of the applicant's claim. *See Jian Tao Lin*, 611 F.3d at 235. Nevertheless, the BIA's asylum eligibility and withholding-of-removal decisions must remain undisturbed if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole. *See id.*

Ultimately, in reviewing agency decisions in immigration matters, it is "our responsibility to ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the factfinder." *Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir.

2009). Hence, an IJ is not entitled to "base [a] decision on only isolated snippets of [the] record while disregarding the rest." *Id.* Nor may the IJ "distort[ ] or disregard[ ] important aspects of the alien's claim," make rulings that are based "on an inaccurate perception of the record," or "rely on speculation, conjecture, or an otherwise unsupported personal opinion to discredit an applicant's testimony or her corroborating evidence." *Jian Tao Lin*, 611 F.3d at 237 (citations, internal quotation marks, and alterations omitted). The deference we accord credibility findings supported by substantial evidence is broad but not absolute. *See id.* at 235. An IJ must offer a specific, cogent reason for rejecting evidence, whether testimonial or documentary, because it lacks credibility. *See Kourouma v. Holder*, 588 F.3d 234, 241 (4th Cir. 2009). Importantly, even if the IJ determines that the applicant's testimony itself is incredible, "he must nevertheless evaluate the applicant's independent evidence." *Jian Tao Lin*, 611 F.3d at 236.

III.

In her petition for review, Tassi contends that the IJ's adverse credibility determinations were predicated on discrepancies not actually present in the record, or on minor inconsistencies that were not central to the claims made in the asylum application. She further maintains that the BIA and the IJ erred by failing to credit or consider any of her corroborating evidence. In analyzing Tassi's petition, we first review the eligibility criteria for asylum, withholding of removal, and relief under the CAT. We then identify multiple errors in the IJ's methodology and assess whether they are harmless.

A.

To establish eligibility for asylum, an applicant bears the burden of showing either past persecution or a well-founded fear of future persecution "on account of race, religion, nationality, membership in a particular social group, or politi-

cal opinion." 8 U.S.C. § 1101(a)(42)(A). If the applicant is able to demonstrate past persecution, she is "presumed to have a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. § 208.13(b)(1).

To qualify for withholding of removal, an applicant "must establish that, if removed, a clear probability exists that h[er] freedom or life would be threatened on account of a protected ground." *Jian Tao Lin v. Holder*, 611 F.3d 228, 236 (4th Cir. 2010) (internal quotation marks omitted). "Whereas both asylum and withholding of removal require an applicant's fear of persecution to be based on an enumerated ground, protection under the CAT is available for those who can prove that, whatever the motivation, it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Id.* (internal quotation marks omitted).

## B.

With the foregoing principles in mind, our analysis of Tassi's petition for review exposes several categories of error. For example, the IJ contravened the principle that corroborative evidence supporting an asylum application cannot be rejected solely because it does not strictly comport with the rules of evidence or because it lacks its own corroborating evidence. The IJ also discredited key documentary evidence because it was not authenticated pursuant to immigration regulations, without providing Tassi an opportunity to authenticate by other means. Another category of error arises from and implicates the IJ's inaccurate perceptions of relevant aspects of the record. Lastly, the IJ improperly relied on speculation and assumption.

## 1.

First, the IJ discredited certain of Tassi's corroborative evidence because it did not adhere to the rules of evidence. It is well-established, however, that "[t]he Federal Rules of Evi-

dence do not apply in immigration proceedings." *Anim v. Mukasey*, 535 F.3d 243, 256 (4th Cir. 2008). Although such rules "may guide an immigration judge in determining admissibility," they cannot be employed as the sole basis for rejecting corroborative evidence, as the IJ did here. *See Kourouma v. Holder*, 588 F.3d 234, 241-42 (4th Cir. 2009). Even though hearsay is admissible as corroborating evidence, *see Anim*, 535 F.3d at 257, the IJ rejected Justice Mbu's expert testimony, as well as the letters of Elad and Kude, because they did not demonstrate firsthand knowledge. Our scrutiny of the IJ Decision begins with some of Tassi's most crucial evidence, Justice Mbu's testimony.

a.

Ironically enough, in assessing Justice Mbu's evidence, the IJ misapplied the inapplicable rules of evidence. Although the IJ accepted Justice Mbu as an expert on human rights and politics in Cameroon, she discredited his expertise on those very subjects, explaining that "he has no first-hand knowledge of [Tassi's] problems in Cameroon." IJ Decision 19. Even when the rules of evidence strictly apply, however, an expert is entitled to rely on factual underpinnings — including those based on hearsay — that are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. It is unclear, however, that Justice Mbu relied on hearsay when he testified about the daily arrests and disappearances of members of SCNC and SCYL, or when he explained that activists who return to Cameroon face persecution or death. Justice Mbu certainly was not relying on hearsay when he confirmed Tassi's active involvement in SCNC in the United States, because he had seen her in attendance at SCNC meetings. Nor was Mbu relying on hearsay when he predicted that, because of Tassi's current support of SCNC, she would be arrested — and possibly killed — if she were forced to return to Cameroon. Indeed, Justice Mbu's expertise was not contested with respect to Tassi's account of past persecution, which Mbu had

verified with her lawyer Elad.[8] And, to the extent that hearsay may have supported Justice Mbu's opinion that Tassi would face persecution in Cameroon because of her past involvement with SCYL, his reliance thereon would not be objectionable under the rules of evidence. Accordingly, the IJ erroneously rejected probative aspects of Justice Mbu's expert testimony.

Of significance, Justice Mbu's testimony pertains directly to one of the IJ's primary credibility findings against Tassi. Tassi initially testified that SCYL "[w]as" "part of" SCNC. J.A. 207. But when the government provided Tassi a printout from the SCYL website purportedly disclaiming that SCYL "is not, and has never been part of" SCNC, Tassi conceded that SCYL was "created independently from the Southern Cameroon." *Id.* at 208. The IJ then determined that this was an inconsistency going to the heart of Tassi's claim, because she served as SCYL's public relations officer and was allegedly persecuted because of her involvement with that group.[9] But Justice Mbu's evidence lends substantial credence to Tassi's understanding. Mbu explained that SCNC "was formed to control . . . subgroups that were a part for the same purpose," and that SCYL is "like the militia wing, in essence," "the youth wing" that "carr[ies] information and . . . pass[es] it back to the SCNC." J.A. 145, 155.[10] It was erroneous, then, for the IJ to fail to provide any specific, cogent reason for dis-

---

[8]As he explained to the IJ, Justice Mbu believed Elad to be "very credible" because Mbu had known Elad since law school and they were "called to the bar the same day." J.A. 154. Justice Mbu had also spoken to Elad to confirm Tassi's version of the relevant events. *See id.* at 157, 159.

[9]On this record, there may well be no inconsistency between Tassi's testimony that SCYL was part of SCNC and her acknowledgement that the two groups were created independently.

[10]The record contains two reports submitted by the government that also characterize SCYL as the "youth organization" of SCNC. *See* J.A. 1088, 1147. Moreover, as Tassi points out, she submitted an article (not addressed by the IJ) describing SCYL "as the militant youth wing of the SCNC," referencing a 2002 SCYL document. *Id.* at 449. That same article observes that the two groups eventually fractured over disagreements about the direction of the independence movement. *Id.* at 450-51. Although the IJ stated that she had "considered the entire record carefully," IJ Decision 13, the IJ Decision does not reveal how either those reports or the article factored into her rulings.

regarding this aspect of Justice Mbu's evidence, particularly when the IJ did not question the Justice's expertise and the nature of the SCNC-SCYL relationship contributed to her credibility determination against Tassi. Indeed, the point concerning that relationship was the only adverse credibility finding against Tassi that, according to the IJ, explicitly went to the heart of Tassi's claims.

b.

Next, the IJ faulted the Elad and Kude letters because they supposedly failed to identify the source of their knowledge about Tassi's persecution in Cameroon. In fact, Elad's letter indicates that Elad is himself the source. Elad's letter specifies that Tassi was "well known" to him and that, as her attorney, he "had to intervene on her behalf in quite a few instances of arrest and intimidation" in order "to secure her release." J.A. 622. Thus, the IJ's basis for discrediting Elad's letter is not only unsupportable as a matter of law, it appears to be constructed upon an "erroneous perception of the record." *See Jian Tao Lin*, 611 F.3d at 238.

Similarly, the IJ discredited Kude's letter for failing to disclose the source of his information that Tassi had "suffered serious torture . . . ranging from harassment, intimidation, several arrest [sic] and detention." *See* J.A. 626. The IJ did not otherwise assess the probative value of that statement or evaluate the reliability of the letter from Kude, who was SCNC's assistant secretary general, and who described Tassi as an "activist" who had "contributed enormously to the struggle" for independence. *Id.* As we have previously observed, however, a "letter from [a] party leader" on behalf of a party member seeking asylum can corroborate the applicant's claims. *See Camara v. Ashcroft*, 378 F.3d 361, 369 (4th Cir. 2004).

2.

Second, implicit in the IJ's evidentiary rulings rejecting Justice Mbu's expert testimony and the Elad and Kude letters

is the notion that corroborative evidence itself "*automatically* require[s] corroboration." *See Marynenka v. Holder*, 592 F.3d 594, 602 (4th Cir. 2010). As we have explained, "[t]here is no general rule that evidence offered in corroboration requires independent corroboration." *Id.* Thus, the IJ erred in summarily rejecting Justice Mbu's testimony and the Elad and Kude letters, as well as the testimony of Anastasia Ade. Although the IJ characterized Anastasia's testimony as "self-serving," it was presented on behalf of Tassi — rather than on Anastasia's behalf — and there was no showing or contention that Anastasia could benefit from it. Anastasia testified about her endeavor to visit Tassi in jail in January 2000, Tassi's physical condition upon being released from custody on January 20, 2000, and about taking Tassi to the hospital that day for treatment. The IJ Decision failed to provide a specific, cogent reason for disregarding this uncontroverted evidence, other than implying that the evidence lacked its own corroboration. *See Marynenka*, 592 F.3d at 602.

3.

Third, the IJ erroneously discredited both the Release Order and the Medico-Legal Certificate because they had not been "authenticated pursuant to 8 C.F.R. § 287.6." IJ Decision 16. We have heretofore recognized, however, that certification pursuant to 8 C.F.R. § 287.6 "is not the exclusive means by which to authenticate such . . . document[s]." *Lin-Jian v. Gonzales*, 489 F.3d 182, 192 (4th Cir. 2007). The *Lin-Jian* alternative exists, in part, because, as the Third Circuit has explained, "asylum applicants can not always reasonably be expected to have an authenticated document from an alleged persecutor." *Gui Cun Liu v. Ashcroft*, 372 F.3d 529, 532 (3d Cir. 2004). Hence, Tassi "ought to have been given an opportunity to authenticate these documents through another method." *Lin-Jian*, 489 F.3d at 192 (citing *Gui Cun Liu*, 372 F.3d at 533). Although the IJ Decision observes that there was no "alternative form of authentication" offered for the Release Order or Medico-Legal Certificate, *see* IJ Decision 16, Tassi

had no cause to defend their authenticity during the IJ hearings. The government and the IJ questioned Tassi — albeit briefly — solely about the Medico-Legal Certificate, and did not express any disbelief or disagreement with Tassi's responses. More importantly, the government did not object to the admission of either the Medico-Legal Certificate or the Release Order in the IJ proceedings. Thus, Tassi could hardly have foreseen that the IJ would doubt the authenticity of either of those documents, and Tassi was not thereafter accorded an opportunity to authenticate them by other means.

Furthermore, the IJ gave no other reason for doubting the authenticity of the Release Order, and her only other bases for discrediting the Medico-Legal Certificate appear to be predicated on conjecture and personal opinion. Although the IJ found it "highly unusual" for a government hospital to document a "police battery," there was no evidence to support such a proposition. *Cf. Marynenka*, 592 F.3d at 601 (rejecting IJ's conjecture on absence of letterhead as legitimate reason for discrediting medical record concerning examination of rape victim). The IJ also found it suspicious that, even though Tassi testified that she spent three days in the hospital, the Certificate did not reflect that fact. Put simply, however, the Certificate could hardly reflect the length of Tassi's hospitalization, inasmuch as it was completed upon her hospital admission, rather than on her discharge.

4.

Fourth, the September 2005 newspaper article in the *The Guardian Post* of Yaounde, the Akwanga letter, and the Fomunyoh affidavit were discredited when the IJ misapprehended their purposes. Tassi submitted the September 2005 newspaper article to corroborate her claim that she was, and likely would be again, a target for persecution in Cameroon. The IJ focused instead on whether Tassi had actually returned to Cameroon after fleeing to the United States in 2002. The IJ first described the September 2005 newspaper article as

specifying that "Tassi Coretha *has* sneaked back" into Cameroon. IJ Decision 5 (emphasis added). Later, the IJ more accurately described the article as reflecting that the "police in Yaounde are seeking Tassi Coretha, who they *believe* has 'sneaked back'" into Cameroon. *Id.* at 17 (emphasis added). The article actually specifies, however, that "[p]olice sources said they *suspect*" that Tassi "has sneaked back." J.A. 583 (emphasis added). Nevertheless, the IJ discredited the article because "[Tassi] testified that she has not returned to Cameroon since she left in 2002." IJ Decision 17. Thus, the IJ credited Tassi's testimony that she had not returned to Cameroon after 2002, and, as a result, apparently found the September 2005 newspaper article — offered to support Tassi's position that she was considered an "activist" in Cameroon and thus likely to be persecuted — to be a fabrication.[11] The IJ failed to address Tassi's specific contention that the police suspicions of her presence in Cameroon in 2005 were predicated on rumors. *Cf. Zuh v. Mukasey*, 547 F.3d 504, 510 (4th Cir. 2008) (criticizing IJ for discounting newspaper article due to government's suggestion that it was fabricated, explaining that "we question the appropriateness of speculating about foreign documents . . . and holding a Cameroonian dissident newspaper to the same standard as the *New York Times* or even the *Baltimore Sun*").

The Akwanga letter attests to Tassi's involvement with SCYL in Cameroon. The Fomunyoh affidavit verifies Tassi's membership in the Southern Cameroons Peoples Conference in the United States. Both the letter and the affidavit thus portend that Tassi would surely face persecution if she were to return to Cameroon.[12] The IJ, nevertheless, discredited the

---

[11]The incongruity here, of course, is that even though the IJ determined that Tassi lacked credibility, the IJ relied on Tassi's credibility to find the September 2005 newspaper article to be incredible. We have recognized, however, that an "IJ cannot have it both ways, finding an applicant and h[er] documents incredible for one purpose and yet relying on them for another." *Zuh v. Mukasey*, 547 F.3d 504, 513 (4th Cir. 2008).

[12]As spelled out heretofore, Akwanga was the founder and national chairman of SCYL. His letter explained that Tassi was "extremely active"

Akwanga letter and the Fomunyoh affidavit because they failed to mention any of Tassi's past arrests in Cameroon. As Tassi emphasizes, however, the IJ misconstrued the purposes of the letter and the affidavit. They were not offered to substantiate past persecution, but to corroborate Tassi's political involvement and repression in Cameroon, and to support the likelihood of her persecution if she returned to Cameroon. Because an objective fear of future persecution is an element of Tassi's claims, the IJ's rejection of the Akwanga letter and the Fomunyoh affidavit was unwarranted.

5.

Finally, the IJ indulged in speculation and assumption in making an adverse credibility finding against Tassi. More specifically, the IJ found it "implausible" that Tassi actually feared detection by airport authorities on leaving Cameroon when she disguised her identity by using the name "Fomuki" as her surname on travel documents. *See* IJ Decision 18. In so doing, the IJ imposed her own assumptions about the steps necessary to evade detection and the efficiency of Cameroonian airport officials in identifying wanted student activists. *Cf. Lin-Jian*, 489 F.3d at 189 (deeming IJ's adverse credibility ruling to rest upon speculation that airport officials would be "equipped to identify citizens sought by family planning cadre"). In fact, according to a report submitted into evidence by the government, there are "[n]o thorough checks . . . made on departure from Douala [Cameroon] airport," "[t]he police did not possess an electronic database on wanted people," and "even a wanted criminal would be able to leave via the air-

in SCYL and had been "blacklisted" by the authorities due to her involvement with SCYL and her ties to him. The Akwanga letter also warned that Tassi's life would be in danger if she returned to Cameroon. *See* J.A. 394-98. Fomunyoh is the chairman of the Southern Cameroons Restoration Movement. Fomunyoh's affidavit explains that government agents track political activists such as Tassi, who "is a sure government target in this respect." *Id.* at 1221.

port. This also applied to those who were active in the political opposition." J.A. 1111.

## C.

In sum, the IJ committed multiple legal and factual errors. In the first category, the IJ erroneously (1) applied the rules of evidence; (2) suggested that corroborative evidence requires further corroboration; and (3) discredited documents as unauthenticated under the immigration regulations without providing Tassi an opportunity to authenticate them by other means and without otherwise providing sound, cogent reasons for rejecting them. Of course, an IJ's errors of law necessarily constitute an abuse of discretion. *See Menghesha v. Gonzales*, 450 F.3d 142, 147 (4th Cir. 2006). In the second category, several of the IJ's factual findings were not supported by substantial evidence, but by inaccurate perceptions of the record or by speculation and assumption. *See Jian Tao Lin*, 611 F.3d at 237. The IJ's legal and factual errors, in turn, thwarted the necessary weighing of Tassi's corroborative evidence against the adverse credibility findings. *See id.* at 236. For its part, the BIA erred in failing to recognize the IJ's multiple errors concerning important aspects of Tassi's claims, rendering the BIA Order manifestly contrary to law and an abuse of discretion. *See id.* at 235.[13]

Having identified a host of erroneous rulings and findings in the IJ Decision and the BIA Order, we are obliged to apply a harmless error analysis. *See Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004). Notwithstanding the presence of error, we are entitled to permit a BIA decision to stand if the legal and factual infirmities "clearly had no bearing on the . . . substance of the decision reached." *Id.* (internal quotation

---

[13]Although the BIA correctly observed that an IJ is "not required to address in detail every aspect of a case," BIA Order 3; *see Tewabe v. Gonzales*, 446 F.3d 533, 540 (4th Cir. 2006), the IJ's given reasons for discrediting Tassi's evidence were contrary to law and thus untenable.

marks omitted). By contrast, we have remanded in immigration proceedings where, "[w]ithout [the IJ's] erroneous perception of the record, it is far from clear that the [IJ] would have" made the inferences and conclusions that she made, *Jian Tao Lin*, 611 F.3d at 238, or if "it is likely that the IJ would have reached a different outcome if he had given due consideration to the independent evidence that he [improperly] discounted," *Anim*, 535 F.3d at 261.

Although Tassi's asylum application was denied largely on the basis of the IJ's adverse credibility determinations, those rulings need not have been fatal to Tassi's claims if the independent evidence was sufficient to overcome them. *See Camara*, 378 F.3d at 369-70. Assessed in the totality, the evidence that was improperly discredited — including Justice Mbu's expert testimony, the Elad and Kude letters, Anastasia Ade's testimony, the September 2005 newspaper article, the Akwanga letter, the Fomunyoh affidavit, the Release Order, and the Medico-Legal Certificate — provide potent corroboration for Tassi's claims of past persecution and a well-founded fear of future persecution. Thus, we are unable to say that the IJ or the BIA would have reached the same result had that evidence been properly assessed.

We are also skeptical of several of the IJ's other adverse credibility findings and bases for discrediting Tassi's documentary evidence.[14] Nevertheless, even assuming the sound-

---

[14]By way of example, we are unable to ascertain how the mere identification of Tassi's occupation as "Business" on her marriage certificate and on her visa application is central to her claims. Moreover, too much is surely made of the missing "s" in Cameroon on the SCYL membership cards. We have ourselves referred to SCNC, for example, as both the "Southern Cameroon National Council," *Zuh*, 547 F.3d at 505, and the "Southern Cameroons National Council," *Anim*, 535 F.3d at 248. Hence, we are hardly suspicious of an omitted "s" on a dissident youth organization's membership card. Finally, although the BIA Order suggests that "there is *prima facie* evidence that a document may have been forged," BIA Order 2, the IJ made no explicit finding of forgery.

ness of the IJ's sundry credibility rulings, she was obliged to "weigh all relevant evidence under the totality of the circumstances." *Zuh*, 547 F.3d at 507. As we have explained, "[t]hose who flee persecution and seek refuge under our laws have the right to know that the evidence they present of mistreatment in their home country will be fairly considered and weighed by those who decide their fate." *Baharon*, 588 F.3d at 233. In these circumstances — without deciding the ultimate issue — our proper disposition is to grant the petition for review and vacate and remand.

## IV.

Pursuant to the foregoing, we grant Tassi's petition for review, vacate the BIA Order, and remand for such other and further proceedings as may be appropriate.

*PETITION FOR REVIEW GRANTED;*
*VACATED AND REMANDED*