**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1525**

GLORIA MARIBEL AGUILAR-AVILA,

Petitioner,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: May 7, 2019                                     Decided: August 9, 2019

Before MOTZ, KING, and THACKER, Circuit Judges.

Petition for review granted and remanded for further proceedings by unpublished per curiam opinion.

**ARGUED:** Japheth Nthautha Matemu, MATEMU LAW OFFICE, P.C., Raleigh, North Carolina, for Petitioner. Julia J. Tyler, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Shelley R. Goad, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Gloria Maribel Aguilar-Avila ("Petitioner"), a native and citizen of Honduras, illegally entered the United States in December 2015. In February 2016, the Government initiated removal proceedings against Petitioner. Petitioner conceded removability but alleged that she was fleeing an abusive relationship. She alleged that her former partner beat her, leaving her with bruises and scars, and threatened to kill her and her family members. She also alleged that her abuser was connected to gang activity in Honduras and Mexico. On that basis, Petitioner sought relief from removal.

The Immigration Judge ("IJ") denied Petitioner's application for relief, and the Board of Immigration Appeals ("BIA") affirmed that denial. Petitioner now seeks review of the final order of the BIA. For the reasons that follow, we grant her petition for review and remand the case to the BIA for further proceedings consistent with this opinion.

I.

A.

Petitioner met Elvis Omar Reyes Lopez 17 years ago. Over the course of their relationship, the pair lived in Lopez's mother's home in Tegucigalpa, Honduras, with their two daughters.[1] According to Petitioner, Lopez was abusive. Petitioner testified that Lopez used cocaine and would succumb to fits of anger and rage. She testified that he verbally abused her (called her "[u]gly things, lots of ugly things" including referring to her as his "property"), beat her (including, at times, in front of her children), hit her in

_____

[1] Petitioner's daughters were born in 2008 and 2004, respectively.

2

the head with a lock (resulting in a hematoma), struck her in the jaw until she lost all of her back teeth ("[h]e would always grab me by the jaw . . . [and] hit me with whatever he had"), grabbed her genitals without consent ("to see if I had come from being with someone"), and stuck a machete into her ribs, threatening to kill her and her family members. A.R. 77, 80.[2] Petitioner further testified that she believed that Lopez was associated with the Mara 18 gang[3] and also had connections to Zetas[4] in Mexico. She testified that Lopez threatened to use his gang affiliations against her if she ever attempted to leave him.

Nonetheless, Petitioner left Lopez in 2011. That year, Petitioner's mother passed away, and Petitioner and her daughters moved into Petitioner's father's home. Petitioner testified that Lopez, incensed because Petitioner left him, stalked her and her daughters. Per Petitioner, Lopez incessantly called her (up to 80 times per day) and demanded that she bring their daughters to him. But when Petitioner brought their daughters to visit

---

[2] Citations to the "A.R." refer to the Administrative Record filed by the parties in this appeal.

[3] The Mara 18 gang is a multi-ethnic, transnational criminal organization. *See* U.S. Agency for Int'l Dev., Central America and Mexico Gang Assessment (2006), https://pdf.usaid.gov/pdf_docs/PNADG834.pdf. Mara 18 originated in Los Angeles but has acquired "arms, power, and influence across the United States, Mexico, and Central America." *Id.*

[4] The Zetas are significant narcotics traffickers in Mexico. *See* U.S. Dep't of Treas. News Release TG-605 (Mar. 24, 2010), https://www.treasury.gov/press-center/press-releases/Pages/tg605.aspx. The Zetas "are responsible for much of the current bloodshed in Mexico." *Id.*

3

Lopez, he would beat her and also beat their daughters. Indeed, Petitioner testified that Lopez once broke a broomstick on their younger daughter's foot.

Although Petitioner and her daughters often saw doctors following instances of abuse, Petitioner would lie to cover up Lopez's behavior. Because she was afraid that Lopez would seek revenge if she reported him, Petitioner told her doctors that the injuries were from falls.

Eventually, Petitioner reported Lopez to the police. But the police told her that there was nothing they could do because it was a "matrimonial situation between a man and woman." A.R. 87. Moreover, Petitioner testified that she did not trust the police because they were corrupt and "infiltrated with the Maras [gang]." *Id.* at 97. And when Petitioner filed a court complaint against Lopez, an attorney informed her that it was "a very long process" to report marital abuse. *Id.* at 87–88. According to Petitioner, the court system was unwilling to protect her because "a number of [j]udges have died [adjudicating cases like hers]." *Id.* at 98.

Petitioner's fear of Lopez increased following her father's death in 2015. Petitioner's father suffered a stroke two hours after he got into an argument with Lopez about Lopez's abuse of Petitioner. Petitioner testified that, once her father died, she did not have any place to go in Honduras. When Petitioner told Lopez of her plan to leave for the United States, Lopez responded that he "kn[e]w some Zetas in Mexico" whom he could command to "disappear [her]." A.R. 108–09.

4

B.

Petitioner ultimately left Honduras to escape her abusive relationship. She entered the United States illegally on December 15, 2015. After having been in the United States for three and a half years, Petitioner says she fears Lopez might kill her or harm her daughters if she returned to Honduras. Petitioner's two daughters are still in Honduras with Lopez's mother. Petitioner explained that she did not leave her daughters with any of her siblings because she was afraid that Lopez would harm her siblings if she did so. Two months after Petitioner entered the United States, the Government charged her as an alien present in the United States without a valid entry document in violation of 8 U.S.C. § 1182(a)(7)(A)(i)(I) and served her with a Notice to Appear for removal proceedings. Petitioner conceded the Government's allegations. Accordingly, the IJ found removability by clear and convincing evidence.

C.

Petitioner sought three forms of relief from removal: asylum pursuant to 8 U.S.C. § 1158, withholding of removal pursuant to 8 U.S.C. § 1231, and Convention Against Torture ("CAT") relief pursuant to 8 C.F.R. § 1208.16(c). In a credible fear interview, application, declaration, and testimony, Aguilar-Avila explained she fled Honduras after years of violent physical and emotional abuse by her former partner and due to fear of his gang affiliation. Before the IJ, Petitioner's attorney asked her direct examination questions but declined the opportunity to ask her any rebuttal questions. And when the IJ asked Petitioner's attorney if he wished to offer closing argument, he said, "No, Judge. I'll leave it." A.R. 118.

5

The IJ issued an oral decision denying Petitioner all three forms of relief, and the BIA dismissed Petitioner's appeal of that decision. Two findings underlying the IJ and BIA decisions are relevant for our purposes here.

First, the IJ concluded that Petitioner failed to demonstrate membership in a particular social group. Before the IJ, Petitioner premised her asylum claim on membership in the particular social group of "Women in Honduras who suffer from domestic violence and are unable to leave their relationship." A.R. 130, 133. Although the IJ acknowledged that Petitioner "clearly testified about abuse" that she suffered, the IJ concluded that she had "not shown that she is entitled to relief based on being in a particular social group that has been recognized as entitled to the relief that she seeks." *Id.* at 49. The BIA affirmed that finding without further explanation. Before the BIA, Petitioner premised her asylum claim on membership in a different particular social group, one based on her status as "a working lower class woman of Honduras targeted by gang activity." *Id.* at 10. The BIA also considered and rejected that particular social group.

Second, the IJ concluded that Petitioner failed to demonstrate that the authorities were unwilling and unable to protect her or that she was unable to reasonably relocate within Honduras. Although the IJ "believe[d] that [Petitioner] over a long term has been subjected to domestic abuse of some form, either physical or mental, through verbal statements made to her," the IJ denied her claim because "[Petitioner] never gave the government [of Honduras] an opportunity to protect her from her partner or to take other steps so that she was protected." A.R. 48–49. Again, the BIA affirmed the IJ's

6

conclusion without any additional explanation. The BIA merely noted that the IJ "denied relief in part because [Petitioner] did not show that the authorities were unable or unwilling to protect her or that she could not reasonably relocate." *Id.* at 3.

D.

Petitioner timely petitioned for review. But Petitioner's attorney failed to timely file an opening brief. And, once filed, the argument section of the opening brief totaled just one and a half pages in length. Indeed, it was composed of only 17 lines of text. In her brief before us, Petitioner also, for the first time, asserted that her asylum claim was rooted in her membership in her nuclear family. Further, Petitioner did not file a reply brief or otherwise rebut the Government's exhaustion and waiver arguments. In fact, Petitioner's attorney conceded at oral argument that Petitioner waived all but her asylum claim. *See* Oral Argument at 27:00–28:00, *Aguilar-Avila v. Sessions*, No. 18-1525 (4th Cir. May 7, 2019), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments.

II.

This court is charged with reviewing both the final decision of the BIA and the underlying decision of the IJ. *See Ai Hua Chen v. Holder*, 742 F.3d 171, 177 (4th Cir. 2014) ("Because the BIA adopted and affirmed the decision of the IJ but supplemented that decision with its own opinion, the factual findings and reasoning contained in both decisions are subject to judicial review." (internal quotation marks omitted)). We uphold agency determinations unless "manifestly contrary to the law and an abuse of discretion." *Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014) (internal quotation marks omitted). The agency abuses its discretion when "it fail[s] to offer a reasoned explanation for its

decision, or if it distort[s] or disregard[s] important aspects of the applicant's claim." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011).

III.

As a threshold matter, we must address the Government's waiver and exhaustion arguments. First, the Government argues that, by failing to raise them in her opening brief to this court, Petitioner abandoned the two particular social groups she raised below -- women in Honduras who suffer from domestic violence and are unable to leave their relationship (presented to the IJ) and working lower class women in Honduras targeted by gang violence (presented to the BIA). Second, the Government argues that Petitioner failed to exhaust her claim with respect to the particular social group that Petitioner raised in her brief to this court -- her nuclear family -- because she failed to present that particular social group to the IJ or BIA.

Although we may not consider a claim that Petitioner has not exhausted, *see* 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if . . . the [petitioner] has exhausted all administrate remedies . . . ."), abandonment and waiver rules are "not jurisdictional in the sense that they encroach in any fashion upon our inherent authority to consider and decide pertinent matters." *United States v. Holness*, 706 F.3d 579, 592 (4th Cir. 2013). Thus, we may exercise our discretion, when the circumstances call for it, to disregard a party's inattention to an argument or issue. *See id.* The circumstances may call for such a departure from our waiver and abandonment rules when the record is sufficient to permit evaluation of the argument or issue and considering the argument or issue would enhance "the efficiency of the decision-making

8

process." *Id.* Further, we should consider whether, if we did not reach the argument or issue, a miscarriage of justice would result. *See Suarez-Valenzuela v. Holder*, 714 F.3d 241, 248 (4th Cir. 2013).

Because Petitioner raised the particular social group of membership in her nuclear family for the first time before this court, we cannot consider it. *See* 8 U.S.C. § 1252(d)(1); *Massis v. Mukasey*, 549 F.3d 631, 638 (4th Cir. 2008) (noting that we may consider such a claim only if the petitioner "has exhausted all administrative remedies available . . . as of right."). But we conclude that the circumstances of this case call for us to consider the particular social group that petitioner presented to the BIA: working lower class women in Honduras targeted by gang violence.

A.

First, the record permits evaluation of Petitioner's membership in that particular social group. During her credible fear interview, in her application and declaration, and throughout her testimony before the IJ, Petitioner described years of violent physical and emotional abuse by her former partner. She testified that her former partner would regularly beat her so viciously that her back teeth and molars fell out. She testified that he grabbed her by the genitals to determine whether she had sex with anyone else. She testified that he stuck a machete in her ribs and threated to stab her.

And, significantly, Petitioner also testified about her former partner's association with the Mara 18 gang and his connections to Zetas in Mexico. Petitioner testified that her former partner asserted that he was having gang members watch her and threatened to have those gang members kill her. Petitioner presented this testimony to the BIA in

9

support of her membership in the particular social group of working lower class women in Honduras targeted by gang violence, but the BIA considered and then dismissed it in its written decision, reasoning that "individuals who are feeling general conditions of violence in a country do not qualify for asylum or withholding of removal." *See* A.R. 3. Accordingly, both the facts underlying the argument and the BIA's resolution of it are clear from the face of the record.

## B.

Further, permitting the poor performance of Petitioner's attorney to prevent us from considering on the merits the sole claim standing between Petitioner and deportation would be a miscarriage of justice. Deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom." *Bridges v. Wixon*, 326 U.S. 135, 154 (1945). For that reason, "[m]eticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness." *Id.* As explained below, review of the IJ and BIA's resolution of Petitioner's asylum claim reveals clear errors. We deem Petitioner's particular social group argument here the rare exception to this court's waiver rule.

## IV.

The Immigration and Nationality Act authorizes the Government to grant asylum to any eligible applicant. *See* 8 U.S.C. § 1158. An applicant is eligible for asylum if she is able to demonstrate "that it is more likely than not that her life or freedom would be threatened in the proposed country of removal because of her race, religion, nationality, membership in a particular social group, or political opinion." *Niang v. Gonzales*, 492

10

F.3d 505, 510 (4th Cir. 2007); *see also* 8 U.S.C. § 1158(a)(2)(A). An asylum applicant must also demonstrate that the past persecution "was inflicted by the government or by others whom the government is unable or unwilling to control." *See Mulyani v. Holder*, 771 F.3d 190, 197–98 (4th Cir. 2014).

## A.

We first consider the conclusions of the BIA regarding Petitioner's membership in a particular social group. Although the statute does not define "particular social group," the BIA has defined it to include three criteria: "(1) its members share common, immutable characteristics, (2) the common characteristics give its members social visibility, and (3) the group is defined with sufficient particularity to delimit its membership." *Cordova*, 759 F.3d at 337 (internal quotation marks omitted).

Before both the IJ and BIA, Petitioner asserted her particular social group was based on her abusive relationship and its connections to gang violence. In support of its conclusion that Petitioner failed to demonstrate membership in a particular social group, the IJ stated,

> While [Petitioner] has clearly testified about abuse that she supposedly has suffered at the hands of her domestic partner, what she has testified about, she has not shown that she is entitled to relief based on being in a particular social group that has been recognized as entitled to the relief that she seeks.

11

A.R. 49. In affirming the decision of the IJ, the BIA stated simply, "[Petitioner] did not demonstrate membership in a particular social group composed of 'working class women of Honduras who are targeted by gang activity.'"[5] *Id.* at 3.

Although our review of these decisions is deferential, the BIA abuses its discretion if it fails "to offer a reasoned explanation for its decision." *Cordova*, 759 F.3d at 337 (internal quotation marks omitted). Indeed, "when a BIA order does not demonstrate that the agency has considered an issue, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id.* at 338 (internal quotation marks omitted).

Here, we conclude the BIA failed to explain why Petitioner's purported social group does not satisfy the criteria set forth by the BIA. The evidence demonstrated that, after Petitioner attempted to leave Lopez in 2011, he continued to harass her, threatening to abuse her when he saw her in person and threatening that he was having her watched by gang members. At minimum, the BIA should have explained why -- in light of these facts -- Petitioner failed to sufficiently prove her membership in a particular social group.

_____

[5] Before the IJ, Petitioner's attorney characterized her particular social group as "wom[e]n in Honduras who suffer from domestic violence and are unable to leave their relationship." J.A. 10. But before the BIA, her counsel characterized her particular social group as "working lower class of wom[e]n of Honduras targeted by gang activity." J.A. 130. The BIA considered both particular social groups, nonetheless. Regarding the particular social group presented to the IJ, the BIA noted that Petitioner could not demonstrate membership in a particular social group composed of "women unable to leave their relationships" because Petitioner "did, in fact, leave the relationship." *Id.* at 3 n.1.

12

*See Cordova*, 759 F.3d at 338 (finding the BIA's failure to analyze a petitioner's purported social group warranted remand).

B.

We next consider the conclusions of the IJ and the BIA that Petitioner failed to demonstrate government acquiescence. On this point, Petitioner must demonstrate that her past persecution was inflicted "by the government or by others whom the government was unable or unwilling to control." *Mulyani*, 771 F.3d at 197–98. Both the IJ and the BIA rejected Petitioner's allegations of government acquiescence. In doing so, the IJ and the BIA erred in two ways.

1.

First, the IJ and BIA required more of Petitioner than the law demands. Both the IJ and the BIA hinged its ruling on its view that Petitioner failed to demonstrate that she could not reasonably relocate. But inability to relocate is only required when an applicant is attempting to show a well-founded fear of future persecution, *not* when she is demonstrating past persecution. *Cf.* 8 C.F.R. § 1208.13(b)(3)(i) ("In cases in which the applicant *has not established past persecution*, the applicant shall bear the burden of establishing that it would not be reasonable to relocate, unless the persecution is by a government or is government-sponsored." (emphasis supplied)).

2.

Second, both the IJ and BIA failed to address evidence pertinent to the requirement that Petitioner demonstrate government acquiescence. In this regard, the relevant question is whether the government of Honduras is willing and able to help

13

Petitioner avoid further abuse at the hands of her former partner. Nonetheless, both the IJ and BIA neglected to address evidence that Petitioner *did* seek help from the government of Honduras, to no avail. Petitioner testified that she attempted to report the violence to the police, but the police told her that there was nothing they could do because it was a "matrimonial situation between a man and woman." A.R. 87.

Further, Petitioner testified that the police in Honduras are corrupt and "infiltrated with the Maras." A.R. 97. According to Petitioner, the court system was unwilling to protect her because "a number of [j]udges have died" adjudicating cases like hers. *Id.* at 98. Such disregard of important aspects of an applicant's claim amounts to an abuse of discretion. *See Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011) ("[A]n IJ is not entitled to base a decision on only isolated snippets of the record while disregarding the rest." (internal quotation marks omitted)).

V.

For the foregoing reasons, we grant Petitioner's petition for review and remand the case to the BIA for further proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED;*
*REMANDED FOR FURTHER PROCEEDINGS*

14