**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-2367

BRYAN ALEXIS MOLINA-DIAZ; CONY VANESSA PASCUAL DE MOLINA

Petitioners

v.

PAMELA JO BONDI, Attorney General

Respondent

No. 23-1923

BRYAN ALEXIS MOLINA-DIAZ; CONY VANESSA PASCUAL DE MOLINA

Petitioners

v.

PAMELA JO BONDI, Attorney General

Respondent

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 27, 2024　　　　　　Decided: February 19, 2025

Before GREGORY, QUATTLEBAUM, and BERNER, Circuit Judges.

2

Petitions denied by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Berner joined. Judge Gregory wrote a dissenting opinion.

———————

**ARGUED:** Benjamin Ross Winograd, IMMIGRANT & REFUGEE APPELLATE CENTER, LLC, Alexandria, Virginia, for Petitioners. Spencer Stephen Shucard, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Lauren Vogt, L&L IMMIGRATION LAW, PLLC, Alexandria, Virginia, for Petitioners. Brian Boynton, Principal Deputy Assistant Attorney General, Keith I. McManus, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

QUATTLEBAUM, Circuit Judge:

Bryan Alexis Molina-Diaz and his wife Cony Vanessa Pasqual de Molina fled El Salvador after witnessing the murder of Cony's cousin Jose. Bryan applied for asylum and withholding of removal. An Immigration Judge ("IJ") denied relief and the Board of Immigration Appeals ("Board") affirmed. Bryan moved for reconsideration, and to reopen based on his prior counsel's ineffective assistance. The Board denied both motions.

Now Bryan petitions for review of both Board decisions. While his petitions challenge those decisions for several reasons, the decisive issue is the requirement that a petitioner show the home government is unable or unwilling to control the non-state persecutor. Bryan claims that after the Supreme Court decided *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), we should abandon that requirement. Alternatively, he argues that even if a petitioner must show the home government's inability or unwillingness to control a non-state persecutor, the IJ and Board conflated inability with unwillingness. Finally, Bryan contends that the IJ and Board ignored evidence about conditions in his home country that satisfies the "unable or unwilling" requirement.

We reject these arguments. First, regardless of *Loper Bright*, binding Fourth Circuit precedent requires an applicant to show the home government's inability or unwillingness to control a non-state persecutor. Second, rather than conflating inability with unwillingness, the IJ and the Board relied on evidence showing the home government's ability and willingness to control non-state persecutors. Third, while the IJ and the Board are not required to address every piece of evidence a petitioner introduces, here they addressed Bryan's generalized country conditions evidence, reasoning that it was

3

outweighed by evidence specific to Bryan. And substantial evidence supports the Board's government control finding. Thus, we deny the petitions for review.

## I.

### A.      Legal Background

A foreigner physically present in the United States may apply for asylum under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–1537. To qualify, the applicant must establish that he meets the definition of "refugee." *Id.* § 1158(b)(1)(B)(i). To do so, he must be "unable or unwilling to return to, and [] unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution." *Id.* § 1101(a)(42)(A). The persecution must be "on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* In other words, a statutorily protected ground must be "at least one central reason" for the claimed persecution. *Id.* § 1158(b)(1)(B)(i). We have described these statutory requirements as a three-element test: the applicant must show (1) he "suffered past persecution or has a well-founded fear of future persecution"; (2) "the persecution is 'on account of' his race, religion, nationality, membership in a particular social group, or political opinion"; and (3) "the persecution is perpetrated by" the applicant's home government or a non-state actor whom the government is "unable or unwilling to control." *Portillo Flores v. Garland*, 3 F.4th 615, 626 (4th Cir. 2021) (en banc) (cleaned up).

Separately, a petitioner may seek withholding of removal. *See* 8 U.S.C. § 1231. The Attorney General may withhold removal to a country if a petitioner's "life or freedom

4

would be threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1231(b)(3)(A).[1] In the Fourth Circuit, a withholding-of-removal petition requires an even stricter persecution showing than an asylum application. *See Lopez-Benitez v. Garland*, 91 F.4th 763, 768 (4th Cir. 2024) (withholding of removal requires "a *clear probability* of persecution," a higher standard than the one applied to asylum applicants (quoting *Mirisawo v. Holder*, 599 F.3d 391, 396 (4th Cir. 2010))).

With that background in mind, we turn to the facts here.

## B.     Factual Background[2]

In June 2015, Bryan and Cony sat on a patio at the house of Cony's mother in La Libertad, El Salvador.[3] On the street below, three individuals stopped Cony's cousin Jose. Their conversation grew heated before one individual pulled out a gun and shot Jose in the head and chest. Bryan saw the killing from the patio. Cony—pregnant at the time—did not

---

[1] Although the current withholding-of-removal statute lacks the word "persecution," the pre-1980 statute prohibited removal when the petitioner faced persecution in his home country. *In re McMullen*, 17 I & N Dec. 542, 545 (BIA 1980). Because Congress only amended the language to comply with treaty obligations, the Board still requires a showing of persecution by the home government or "at the hands of an organization or person from which the government cannot or will not protect the alien." *Id.* The Fourth Circuit also requires a showing of persecution. *See*, *e.g.*, *Lopez-Benitez v. Garland*, 91 F.4th 763, 768 (4th Cir. 2024).

[2] The case-specific facts derive largely from Bryan's and Cony's testimony at a hearing before the IJ.

[3] The Joint Appendix refers at times to Connie. But since the official, government records use Cony, we use that spelling.

5

see the shooting. Bryan quickly instructed her to go inside. He remained on the patio, in shock. One of the individuals, carrying a gun, ran down a nearby alley. He and Bryan saw each other. Bryan thought these individuals were members of the MS-13 gang.

Bryan went inside after several minutes to call 911. Police responded to the call, closed the street and began investigating. Bryan did not speak to the police out of fear that corrupt police officers would report him to the gang likely responsible for Jose's killing: MS-13. This fear stemmed from a prior run-in between Bryan and a corrupt police officer, who beat Bryan and revealed a tattoo of an opposing gang. Jose's family did speak with the police officers on the scene.

The family planned a funeral to honor Jose. An MS-13 member texted Jose's brother, warning him that "[t]here were no men allowed to be there on that day." J.A. 280. Jose's brother informed family members and friends about the text. Ultimately, Bryan attended. The police secured the funeral and it proceeded without incident. As Bryan explained, "nothing happened because the family had requested security." J.A. 281.

MS-13 members threatened Bryan several times later that summer. In early July, two individuals intercepted Bryan while he delivered a gas cylinder for work. They told him that they knew he witnessed Jose's murder. And they warned that if he talked, he would have problems. Several weeks later, three individuals—wearing masks and carrying firearms—confronted Bryan. One individual handed Bryan a cell phone. An MS-13 leader on the phone told Bryan not to talk about Jose's murder. Then his tone changed and he said, "I don't want to see you in . . . this area anymore. Leave this place." J.A. 288. The

6

leader told Bryan that if he did not leave, the gang would kill him "as it happened to Jose." J.A. 289.

Bryan and Cony fled to the United States. They were detained upon arrival. The United States issued them both Notices to Appear. Bryan applied for asylum, withholding of removal and relief under the Convention Against Torture. Cony did not file her own application but is a derivative beneficiary of Bryan's application. J.A. 221; *see* 8 U.S.C. § 1158(b)(3)(A) (granting asylum to the spouse or child of an applicant who is granted asylum).

### C.      Procedural Background

An IJ held a hearing on January 31, 2019. Bryan and Cony both testified. Bryan's counsel entered "country conditions" evidence about El Salvador into the record. This evidence included an expert affidavit from Professor Eric Hershberg, 2017 and 2018 State Department reports, a 2016 Canadian Immigration and Refugee Board report and a 2018 Freedom House report.[4]

The IJ found Bryan's and Cony's testimony credible and corroborated by the supporting documentary evidence. But ultimately, he rejected their asylum and withholding-of-removal claims. The IJ noted Bryan's purported particular social groups: (1) the family of Jose; (2) male members of Jose's family; (3) Cony's immediate family;

---

[4] The IJ gave the expert report reduced evidentiary weight because the government was unable to cross-examine Professor Hershberg and he never met with Bryan. J.A. 253–56.

7

and (4) El Salvadoran witnesses to gang murders. Although he rejected El Salvadoran witnesses to gang murders as neither particular nor socially distinct, the IJ found the first three groups valid under Fourth Circuit precedent recognizing familial relationships as particular social groups. He concluded, however, that Bryan failed to show that "even one central reason for the harm suffered or feared . . . is on account of [his] membership in any of these purported family based particular social groups." J.A. 223. The individuals threatened Bryan, the IJ reasoned, not because of his family relationship but because "he was the only one who had witnessed Jose's murder." *Id.* Also, the IJ explained that the text message banning men from attending the funeral had unclear motivations and was insufficient on its own to satisfy the nexus requirement. The IJ independently found that Bryan failed to show El Salvador's inability or unwillingness to control the non-governmental actors. According to the IJ, police responded promptly after Bryan called 911 and began investigating the murder. They also provided effective security at Jose's funeral.[5]

Bryan challenged the IJ's decision in an appeal to the Board. The Board reviews all the IJ's findings of fact, including credibility determinations, for clear error. 8 C.F.R. § 1003.1(d)(3)(i). And it reviews all other issues *de novo*. *Id.* § 1003.1(d)(3)(ii). Applying these standards, the Board "adopt[ed] and affirm[ed] the decision of the Immigration

---

[5] The IJ also denied relief under the Convention Against Torture because Bryan did not demonstrate that he faces a "more likely than not chance of torture" upon return to El Salvador. J.A. 224. Bryan waived this issue by not appealing it to the Board. J.A. 177 n.2.

8

Judge." J.A. 178. First, the Board found that the IJ did not clearly err when finding that "the individuals who threatened [Bryan], were, or are motivated in any respect by any of these familial relationships." *Id.* Second, the Board affirmed the IJ's finding that Bryan cannot satisfy the "unable or unwilling" government control requirement. According to the Board, the specific facts in the case demonstrated the authorities' effective response to the murder and protection at the funeral. And the Board was unpersuaded by the general country conditions evidence in light of the specific case evidence.

Bryan, represented by new counsel, moved for reconsideration. He challenged the Board's application of clear error review to the nexus finding and the existence of the "unable or unwilling" government control requirement. He also moved to reopen, alleging that his prior attorney provided ineffective assistance by failing to file an asylum application on behalf of Cony. The Board denied both motions. First, the Board determined that it had properly applied clear error review to the factual finding of the persecutor's motive, even though that factual finding undergirds the legal "nexus" conclusion. Second, the Board explained that it and the Fourth Circuit have long applied the government control requirement "based upon the statutory definitions of 'refugee' and 'persecution.'" J.A. 4. According to the Board, the IJ did not err in finding Bryan failed to meet this burden. Finally, the Board held that Bryan had not shown prejudice for his ineffective assistance claim. Cony's hypothetical asylum application would also fail the "unable or unwilling" government control requirement. Last, the Board felt prior counsel persuasively argued that he strategically chose not to file an application for Cony.

9

Bryan now petitions for review of the IJ's and Board's decisions.[6] *See Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014) ("When, as here, the BIA adopts and affirms the IJ's decision and supplements it with its own opinion, we review both decisions."). He argues that we should not apply the "unable or unwilling" government control requirement after the Supreme Court overturned the *Chevron* doctrine in *Loper Bright*.[7] Molina-Diaz Suppl. Br. 1. Even if we apply the requirement, Bryan alleges legal error because the Board conflated inability with unwillingness and ignored the country conditions evidence. Molina-Diaz Br. 19–30. Bryan also renews his challenges regarding ineffective assistance of counsel and the Board's review of the nexus determination. *Id.* at 31–56.[8]

## II.

We deny the petitions for review. First, binding Fourth Circuit precedent, which does not defer to the Board under *Chevron*, requires a petitioner to show that the home government is "unable or unwilling" to control non-state persecutors. Second, the Board did not conflate inability with unwillingness or ignore the country conditions evidence. And because a reasonable adjudicator would not be *compelled* to find Bryan showed El

---

[6] Bryan petitioned for our review of the Board's initial decision, *see* Case No. 21-2367. He subsequently petitioned for our review of the Board's denial of his motions to reconsider and reopen, *see* Case No. 23-1923. We resolve both petitions in this appeal.

[7] *See Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

[8] We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1) and (b)(6).

10

Salvador's inability or unwillingness, substantial evidence supports the Board's determination.

## A. Existence of Government Control Requirement

In *Loper Bright*, the Supreme Court overturned the *Chevron* doctrine. *Loper Bright*, 144 S. Ct. at 2273. Section 706 of the APA requires courts to decide "'all relevant questions of law' arising on review of agency action." *Id.* at 2261 (quoting 5 U.S.C. § 706). A court *may* give weight to an agency's authoritative interpretation but ultimately must rule on matters of law. *Id.* at 2262 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Bryan claims we adopted the "unable or unwilling" government control requirement without any independent judgment. Molina-Diaz Suppl. Br. 5. Allegedly, we adopted the requirement only because the Board did. *Id.* He argues that we should keep the test but root it in the INA's "well-founded" fear of persecution language. *Id.* at 6.[9] We review this legal question *de novo*. *Portillo Flores*, 3 F.4th at 625.

---

[9] The government argues that Bryan failed to exhaust this argument. Gov. Suppl. Br. 9 n.5. 8 U.S.C. § 1252(d)(1) imposes a non-jurisdictional but mandatory exhaustion requirement. *See Santos-Zacaria v. Garland*, 598 U.S. 411, 417 (2023); *Tepas v. Garland*, 73 F.4th 208, 213 (4th Cir. 2023). If a petitioner raises an issue in an appeal to the Board and the Board "goes on to 'address' that issue, we possess jurisdiction to review it." *Portillo Flores*, 3 F.4th at 632. And the exhaustion requirement does not bar "specific, subsidiary legal arguments, or arguments by extension, that were not made below." *Ramirez v. Sessions*, 887 F.3d 693, 700 (4th Cir. 2018).

In his motion to reconsider, Bryan argued that the INA does not include *any* "unable or unwilling" government control requirement. Now Bryan argues that the INA includes the requirement, but elsewhere in the statute. Molina-Diaz Suppl. Br. 6–12. The second argument is a subsidiary legal argument of the first. The Board's rejection of Bryan's earlier argument—concluding that "refugee" and "persecution" require an "unable or unwilling" government control inquiry—would similarly resolve his current challenge. Thus, he has satisfied § 1252(d)(1)'s claim-processing rule.

11

It is true that the Board addressed the government control requirement before any Fourth Circuit decisions on the issue. It has long required a showing of persecution by a government or an actor whom the government cannot control in the withholding-of-removal context. *See, e.g.*, *In re Eusaph*, 10 I & N Dec. 453, 455 (BIA 1964); *In re Tan*, 12 I & N Dec. 564, 568 (BIA 1967); *In re Pierre*, 15 I & N Dec. 461, 462 (BIA 1975); *see also Rosa v. INS*, 440 F.2d 100, 102 (1st Cir. 1971). After Congress amended the Refugee Act in 1980 to conform the INA with the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267, the Board considered whether an asylum applicant had to make the same showing. *See In re Acosta*, 19 I & N Dec. 211, 219 (BIA 1985). The Board answered affirmatively because the meaning of "persecution" had been well-settled, and Congress could have easily defined the term otherwise. *Id.* at 222–23. In other words, the Board "incorporated the 'accepted construction' of [persecution] into the refugee definition." *Ortiz v. Garland*, 6 F.4th 685, 688 (6th Cir. 2021).

We first embraced the "unable or unwilling" government control requirement in 1988. In *M.A. A26851062 v. INS*, we explained that a draft-dodging applicant needed to show "the Salvadoran government is unwilling or unable to control the offending group, here, the armed forces." 858 F.2d 210, 218 (4th Cir. 1988), *vacated* 899 F.2d 304, 314 (4th Cir. 1990) (en banc) (rejecting a government control inquiry in the draft-dodger context because, unless the government's non-action has been condemned by a recognized public governmental body, the inquiry "would place [a court] in precisely the political posture that we have attempted to avoid"). The *M.A.* court cited three Ninth Circuit cases for this

12

requirement—without any deference or even citation to the Board. 858 F.2d at 218 (citing *Lazo-Majano v. INS*, 813 F.2d 1432, 1434 (9th Cir. 1987); *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1284 (9th Cir. 1984); *McMullen v. INS*, 658 F.2d 1312, 1315 n.2 (9th Cir. 1981)).[10] Many subsequent Fourth Circuit decisions have restated and applied the government control requirement. *See, e.g.*, *Lopez-Soto v. Ashcroft*, 383 F.3d 228, 234 (4th Cir. 2004), *vacated sub. nom on other grounds by Lopez-Soto v. Gonzales*, No. 03-1331, 2005 U.S. App. LEXIS 29560, at *1 (4th Cir. July 26, 2005); *Sydykov v. Gonzales*, 127 Fed. App'x 100, 100–01 (4th Cir. 2005) (per curiam); *Soliman v. Holder*, 373 Fed. App'x 384, 385 (4th Cir. 2010) (per curiam).

While our more recent decisions note the Board's interpretation, they still do not defer to the Board under *Chevron*. We cited the Board's *In re Acosta* decision in *Crespin-Valladares v. Holder*, 632 F.3d 117, 128 (4th Cir. 2011). But we also cited several out-of-circuit decisions applying the requirement. *Id.* And elsewhere in *Crespin-Valladares*, we explicitly applied *Chevron* deference. *Id.* at 124 (deferring to the Board's interpretation of "particular social group" under *Chevron*). In contrast, we did not defer to the Board under *Chevron* on the "unable or unwilling" government control requirement. In *Mulyani v. Holder*, we described the requirement as "not explicit in the INA." 771 F.3d 190, 198 (4th Cir. 2014). It "derives from the board's interpretations of two words with profound significance in asylum law—namely, 'refugee' and 'persecution.'" *Id.* Those references to

---

[10] None of these cases applied *Chevron* deference to the Board's interpretation of the INA. In fact, *McMullen* predates the Supreme Court's *Chevron* decision.

the Board's interpretation still do not indicate *Chevron* deference. We never said we were deferring, and we did not mention *Chevron*. To the contrary, we cited persuasive out-of-circuit and binding Fourth Circuit precedent imposing the requirement. *Id.* at 198–99, 198n.4. And no party in *Mulyani* even "dispute[d] the need to establish governmental unwillingness or inability to control private actors." *Id.* at 199.[11]

These prior decisions imposing an "unable or unwilling" government control requirement in the INA continue to bind us. *Loper Bright* did not "specifically reject[] the reasoning on which" the prior Fourth Circuit decisions were based, so we must adhere to them. *Qingyun Li v. Holder*, 666 F.3d 147, 150 (4th Cir. 2011) (recognizing that prior Fourth Circuit decisions bind this Panel). Bryan's attack on the "unable or unwilling" government control requirement is "simply wrong on the law." *Pineda-Perez v. Garland*, No. 22-1212, 2023 WL 5771045, at *1 (4th Cir. Sept. 7, 2023) (rejecting a similar challenge to the government control requirement).

## B. Conflation of Inability and Unwillingness

Bryan argues that the IJ and Board conflated inability with unwillingness. Molina-Diaz Br. 19–25. We review this legal question *de novo*. *See Hernandez-Avalos v. Lynch*, 784 F.3d 944, 948 (4th Cir. 2015).

---

[11] *Mulyani* also confirmed that the "unable or unwilling" government control requirement applies in the withholding-of-removal context. *See* 771 F.3d at 198 ("Withholding of removal is also based on *persecution* . . . ." (emphasis added)); *see also Lopez-Benitez*, 91 F.4th at 768.

An applicant satisfies the government control requirement if he demonstrates the home government's inability *or* unwillingness to control a private actor. *See Orellana v. Barr*, 925 F.3d 145, 151 n.3 (4th Cir. 2019). Relying on the First Circuit's *Rosales Justo* decision, Bryan argues the record may support a conclusion that the government was willing to control the gangs, but not that it was able to. *See Rosales Justo v. Sessions*, 895 F.3d 154, 162–63 (1st Cir. 2018). In that case, after a gang murdered respondent's son, an IJ determined that a police investigation demonstrated Mexico's willingness to control the gang. *Id.* at 159. But country conditions evidence demonstrated Mexico's inability to protect respondent. *Id.* at 159–60. The Board reversed, concluding the police investigation demonstrated both willingness and ability. *Id.* at 160. The First Circuit then reversed the Board because the police investigation showed Mexico's willingness—but nothing about its ability—to control the gang. *Id.* at 163. The Ninth Circuit similarly concluded that the Board relied on evidence of Mexico's efforts to combat drug violence while failing to "examine the *efficacy* of those efforts." *Madrigal v. Holder*, 716 F.3d 499, 506–07 (9th Cir. 2013) (emphasis added).

According to Bryan, the Board did the same thing here. We disagree. The record shows that the IJ and Board sufficiently considered both willingness and ability in Bryan's case. As to willingness, the IJ noted the authorities' prompt response to Bryan's 911 call and their launching of an investigation into Jose's killing. As to ability, the IJ explained that police "secured the area" of the murder and they "provided security at Jose's funeral." J.A. 224. The Board cited this same evidence. The authorities' success in securing Jose's

15

funeral, despite an explicit threat from MS-13, particularly reflects El Salvador's ability and distinguishes this case from *Rosales Justo* and *Madrigal*.[12]

### C.    Consideration of Country Conditions Evidence

Bryan argues that the IJ and Board ignored his country conditions evidence showing El Salvador's struggles to control MS-13. Molina-Diaz Br. 25–30. To the extent Bryan is arguing that the IJ and Board legally erred by not mentioning the country conditions evidence, we reject the argument as doubly flawed. First, the IJ and Board are "not required to discuss every piece of evidence in the record." *Nolasco v. Garland*, 7 F.4th 180, 190 (4th Cir. 2021) (cleaned up). We "presume that, in reaching their conclusions, the IJ and the Board reviewed the evidence presented to them and made their decisions based on relevant evidence." *Id*.

Second, Bryan's argument overlooks important details in the record. The IJ referenced the country conditions evidence when finding Bryan's and Cony's testimony credible and "consistent with their written applications and affidavits, as well as with the *supporting corroborative evidence*." J.A. 222 (emphasis added). And in affirming the IJ's

---

[12] Bryan takes great issue with the IJ's citation to *In re A-B-*, 27 I & N Dec. 316 (A.G. 2018) (*A-B- I*), where the Attorney General may have increased the stringency of the government control requirement by stating an applicant must show the government had "a complete helplessness to protect the victims." *Id.* at 337. After ensuing litigation, the Attorney General rescinded *A-B- I*. *See In re A-B-*, 28 I & N Dec. 307, 309 (A.G. 2021) (*A-B- III*). But nothing in the IJ's decision suggests he applied a "complete helplessness" standard. The IJ's citation to *A-B- I* after discussing security at Jose's funeral likely references *A-B- I*'s general point that "[n]o country provides its citizens with complete security from private criminal activity, and perfect protection is not required." *In re A-B- I*, 27 I & N Dec. at 343.

16

determination that Bryan had "not established that El Salvador would be unwilling or unable to protect him or his wife," the Board first identified evidence the IJ felt contradicted Bryan's claim—specifically that after Jose's death, the police responded immediately by securing the area, searching for fingerprints and speaking with witnesses. J.A. 178. The Board also explained that Bryan's family requested the police provide security at Jose's funeral. *Id.* Then, the Board weighed that evidence against the country condition evidence Bryan introduced. The Board reasoned that "[g]iven the evidence in this specific case, we are unpersuaded by [Bryan's] assertion that general country evidence established the Salvadoran [government]'s inability or unwillingness to protect him and his wife from gang violence." *Id.* Plainly, the Board considered the country conditions evidence. It mentioned it but found it less persuasive than other evidence in the case.

To the extent Bryan is challenging the agency's factual findings, we review only for substantial evidence. *Cordova*, 759 F.3d at 337. We treat the agency's finding "as conclusive unless the evidence was such that any reasonable adjudicator would have been compelled to a contrary view." *Orellana*, 925 F.3d at 151; *see* 8 U.S.C. § 1252(b)(4)(B). As explained above, the IJ and Board noted the authorities' prompt response to Bryan's 911 call and the launching of an investigation as examples of willingness. Additionally, their securing of the murder scene and effective protection at Jose's funeral demonstrated ability. And the persecutors' threats to Bryan exhibit some level of concern about the authorities. Bryan points to record evidence leaning the other way: the country conditions evidence and Bryan's testimony about police corruption. Perhaps a reasonable adjudicator could have weighed the record evidence differently, but a reasonable adjudicator would

17

not be *compelled* to find El Salvador unable or unwilling to protect Bryan from MS-13. Sufficient evidence supports the IJ's and the Board's findings.

The dissent states "[i]n now the fourth opinion discussing Petitioners' asylum applications, not a drop of ink has been spilled to address the significant, unrebutted evidence presented that El Salvador is unable to control MS-13." Diss. Op. at 20. And later the dissent insists that we "extend[] the rule that an agency need not discuss each and every piece of evidence into a rule permitting the discussion of no evidence at all so long as the existence of evidence is mentioned." Diss. Op. at 26. With respect, we disagree. As already noted, the IJ (J.A. 222), the Board (J.A. 178) and this opinion all discuss the country conditions evidence Bryan submitted. Beyond that, the Board, whose final decision we review, did not merely mention the evidence. It explicitly weighed the evidence against other case specific evidence, finding the case specific evidence more persuasive. Thus, the record reveals the Board "heard and thought" about the country conditions evidence. *Chen v. Garland*, 72 F.4th 563, 572 (4th Cir. 2023). What's more, neither *Cordova*, 759 F.3d at 340, nor *Orellana*, 925 F.3d at 152—both of which the dissent cites to argue that the Board may not ignore evidence—involve a record like this one, where the Board explained that it found the case-specific evidence more persuasive than the country conditions evidence. In sum, while our good colleague in dissent might prefer more from the Board, the law does not require it.

### D.     Ineffective Assistance and Nexus Challenges

Last, our decision on the "unable or unwilling" government control requirement resolves Bryan's ineffective assistance and nexus challenges. First, because Bryan failed

18

to satisfy the "unable or unwilling" government control requirement, he cannot demonstrate prejudice on the ineffective assistance claim. *See Figeroa v. INS*, 886 F.2d 76, 78 (4th Cir. 1989) (a claim of ineffective assistance at a deportation proceeding requires a showing of (1) compliance with certain procedural requirements; (2) "ineffective representation"; and (3) "prejudice to [the applicant] which occurred as a result of that ineffectiveness"). Cony's asylum application would fail because she cannot demonstrate El Salvador's inability or unwillingness to protect her from MS-13. Second, we need not address Bryan's nexus argument because his failure to meet the "unable or unwilling" government control requirement disposes of his petitions for review.

## III.

Accordingly, we deny the petitions for review.

*PETITIONS DENIED*

19

GREGORY, Circuit Judge, dissenting:

While I agree with much of the analysis of my colleagues, I respectfully dissent from the affirmance of the mere perfunctory treatment of the country conditions evidence provided by Bryan and Cony in this case. In now the fourth opinion discussing Petitioners' asylum applications, not a drop of ink has been spilled to address the significant, unrebutted evidence presented that El Salvador is unable to control MS-13. The majority twists our prior cases beyond recognition, converting a rule that IJs and the BIA need not consider *all* evidence in the record into a rule that they need not consider *any* evidence so long as they passingly mention that evidence exists in the ether.

Rather than following our prior cases requiring immigration authorities to provide *some* discussion of countervailing evidence, the majority affirms based on a few words and an unsupported inference that the BIA and IJ did not find the country conditions evidence persuasive. While the BIA and IJ did not technically ignore the existence of country conditions evidence, for the majority, a one sentence acknowledgement was somehow sufficient to meet the requirements of our precedent. But, in the BIA and IJ decisions before us, there is no discussion of any of the several country conditions reports: where they came from, what they said, or why they might be outweighed by the specific facts of this case.

## I.

Before the IJ, Bryan and Cony presented several country conditions reports. Because the IJ, the BIA, and the majority does not discuss the substance of these reports in any

20

meaningful respect, I provide here a summary of the country conditions evidence presented. This includes a detailed expert report from Dr. Eric Herschberg, professor of Government and Latin American Studies at American University, and several government-produced country conditions reports, including two from the United States Department of State.

These reports describe how gangs in El Salvador are effectively political actors. As Dr. Herschberg explained, "[t]he sheer size of El Salvador's gangs and their proclivity for violence pose a serious threat to the prevailing economic, legal, and political structures of El Salvador." J.A. 415. "Today, gangs in El Salvador do in fact exercise territorial control, collecting 'taxes' through widespread extortion networks and dictating social norms in the areas under their dominion." J.A. 416. "They actively compete with, displace, merge with (through corruption), and fill gaps in governance where the formal state is virtually nonexistent, entering and running community associations and regularly interacting with local community and religious leaders." *Id.* "Government officials and political parties at the local and national level have treated the gangs as a political actor by entering into negotiations with them." *Id.*

The reports also find that El Salvador's police force is woefully ineffective in combatting MS-13. Per the U.S. Department of State's 2017 Human Rights Report for El Salvador, "[i]nadequate training, failure to implement the administrative police career law, arbitrary promotions, insufficient government funding, failure to enforce evidentiary rules effectively, and instances of corruption and other crimes limited the [national police's] effectiveness." J.A. 418. Efforts by El Salvador to combat gang violence have led to mass resignations of officers due to fear of retribution by gangs against the police. J.A. 419.

21

Police efforts to combat gang violence are further impeded by El Salvadoran citizens' fear of cooperating with law enforcement, both due to gang reprisals for those who report gang violence and the inability or unwillingness of police to protect witnesses. *Id*. This is compounded by rampant corruption within police departments, often by officers who fear for their own safety and thus work with gangs. *Id*. This has led the State Department to "recognize[] that the 'principal human rights problems' in El Salvador include 'widespread corruption' and 'weak rule of law.'" *Id.*

As Dr. Herschberg explained, "MS-13's dominance is dependent upon its ability to instill fear in the population living in territories it controls, and those individuals who refuse to comply with the gang's demands, directly challenge its authority, and/or witness its criminal activities represent threats that must be neutralized." J.A. 412. "Gang members believe that failing to exact revenge against anti-gang dissidents would be ruinous to their status within their own gang, among gang rivals, and the public." J.A. 418. "[A] central component of gang tactics is to punish family units as a whole for the transgressions of any one of its members," primarily to "engender fear and subordination." J.A. 412.

The above led Dr. Hershberg to conclude that, "if [Bryan] were to return to El Salvador in defiance of gang demands, he would expose himself and Cony to retaliatory violence from gang members who will want to ensure that others do not commit similar transgressions." J.A. 421. Indeed, Dr. Hershberg stated that "it is my professional opinion that they would be at high risk for substantial physical harm—including murder—if removed to El Salvador." J.A. 421.

22

But, although the IJ found Dr. Herschberg to have an "impressive, pretty comprehensive" resume, J.A. 256, the IJ inexplicably failed to discuss the substance of his detailed report in any respect.  Nor did the BIA, nor the majority.

## II.

While the IJ's factual findings are subject to an "extremely deferential standard," *Menghesha v. Gonzales*, 450 F.3d 142, 147 (4th Cir. 2006), an IJ cannot ignore legally significant testimony without justification.  "We presume that, in reaching these conclusions, the IJ and the BIA reviewed the evidence presented to them and made their decisions based on the relevant evidence." *Martinez v. Holder*, 740 F.3d 902, 914 (4th Cir. 2014).  However, "it is our responsibility to ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the fact finder." *Cordova v. Holder*, 759 F.3d 332, 340 (4th Cir. 2014) (internal citations and quotation marks omitted); *see also Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011) ("[A]n IJ is not entitled to base a decision on only isolated snippets of the record while disregarding the rest.") (cleaned up).  When disregarding "credible, significant, and unrebutted evidence," agency adjudicators must offer "'specific, cogent reasons'" for doing so.  *Orellana v. Barr*, 925 F.3d 145, 152 (4th Cir. 2019) (quoting *Tassi*, 660 F.3d at 722) (cleaned up).  Because the IJ disregarded "relevant evidence" and "the BIA adopted the IJ's flawed conclusion," it is my view that we are "constrained to vacate a portion of the agency's asylum decision." *Portillo Flores v. Garland*, 3 F.4th 615, 636 (4th Cir. 2021).

23

As the majority correctly notes, there is, of course, no categorical requirement that the agency "discuss every piece of evidence in the record." *Ai Hua Chen v. Holder*, 742 F.3d 171, 179 (4th Cir. 2014). But an agency must announce its decision "in terms sufficient to enable a reviewing court to perceive that they have heard and thought" about that evidence. *Chen v. Garland*, 72 F.4th 563, 572 (4th Cir. 2023) (citation and quotation marks omitted). A "wholesale failure" to discuss or engage with country conditions reports "hampers our ability to meaningfully review what was decided below" and, thus, constitutes reversible error. *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 974 (4th Cir. 2019) (cleaned up).

III.

Immigration authorities here failed to sufficiently discuss highly probative evidence, and the decisions must be vacated for the BIA to do so. *See Orellana*, 925 F.3d at 152. The majority's affirmance runs counter to this Court's precedents that require something more than a perfunctory acknowledgement of strong counterevidence by agency adjudicators.

The majority bases its conclusion that the BIA adequately considered the reports submitted into evidence by Petitioners on a summary statement by the BIA that they did not find the reports persuasive. Majority Op. at 16–17. The IJ's oral decision does not even mention the existence of country conditions evidence, only that it found Cony and Bryan to have "testified credibly" and that their testimony was "largely consistent with their written applications and affidavits, as well as with the supportive corroborative evidence." J.A. 222. And the BIA only cursorily mentioned the existence of country

24

conditions evidence, stating that they were "unpersuaded by the respondent's assertion that general country evidence establishes the Salvadoran's inability or unwillingness to protect him and his wife from gang violence." J.A. 612. But because the BIA cited case-specific evidence that showed police could secure an area from MS-13 for a matter of hours or appear at a murder scene after said murder occurred in broad daylight, the majority holds that the BIA need not have discussed any of the country conditions reports presented in this case. Majority Op. at 16–17. The majority fails to cite a single case in which we denied a petition for review where immigration authorities so summarily treated similar country conditions evidence, let alone in a case such as this where the evidence provided is so strong.

This Court has repeatedly emphasized that "State Department Country Reports [are] . . . the definitive word in asylum cases." *See Portillo Flores*, 3 F.4th at 650 (Quattlebaum, J. dissenting) (citing *Ai Hua Chen*, 742 F.3d at 179). The failure to consider these reports is grounds for reversal, even when the reports are not introduced into evidence. *See Hernandez-Avalos v. Lynch*, 784 F.3d 944, 952–53 (4th Cir. 2015) (reversing BIA where it failed to take notice of and consider the State Department's Human Rights Report); *compare Nunez-Gonzalez v. Garland*, No. 22-2276, 2024 WL 3756146, at *5 (4th Cir. Aug. 12, 2024) (affirming IJ and BIA after both opinions considered and rejected the country conditions reports). Given that that IJ had these reports, yet failed to discuss them in any respect, its factual finding cannot be upheld.

Further, the failure to discuss or even mention the report of Dr. Herschberg similarly and independently requires vacatur. We have no indication of the reasoning that the BIA

25

or IJ used in rejecting this evidence. In fact, all we *do* have is the IJ's determination that Dr. Herschberg is exceptionally well-qualified. J.A. 256. The IJ and BIA's failure to address and engage with his report "hampers our ability to meaningfully review what was decided below" and requires remand for the BIA to explain its wholesale rejection of this compelling evidence. *Rodriguez-Arias*, 915 F.3d at 974.

The majority attempts to distinguish our prior cases in which we emphasized that agency adjudicators *must* consider and reject credible evidence that is directly contrary to their conclusion. *See Ai Hua Chen*, 742 F.3d at 181; *see also Orellana*, 925 F.3d at 152. The majority cites *Nolasco v. Garland* for the proposition that an agency need not explicitly mention the entirety of the record. 7 F.4th 180, 190 (4th Cir. 2021). While this is an accurate statement of the law, the majority extends the rule that an agency need not discuss each and every piece of evidence into a rule permitting the discussion of no evidence at all so long as the existence of evidence is mentioned. Majority Op. 16–18. *Nolasco* does not support such a contortion of the law.

In *Nolasco*, we noted with approval that the BIA discussed several pieces of country conditions evidence provided by petitioner and rejected the assertion that the BIA must provide a detailed discussion of every piece of that evidence. *Id*. at 191. We dismissed the petitioner's aspersions that the IJ ignored country conditions evidence by highlighting the evidence that the IJ explicitly did consider, including "the IJ's specific reference to country reports, the State Department Report, and articles showing the problems between the gangs and the country's police." *Id*. at 189 (quotation marks omitted). We also noted that "the IJ and BIA specifically addressed some of the evidence he contends they ignored,"

26

including "the content of both the State Department Report and the Intercept article about a Barrio 18 member who attempted to leave the gang." *Id*. at 189–91. Because the BIA considered significant portions of the country conditions evidence before it, we held that it need not have explicitly discussed every single piece of evidence in the record.

By contrast, in the case before us, the BIA and IJ did not discuss *any* of the country conditions evidence provided by the parties beyond one summary statement that it did not find the evidence persuasive. Despite the majority's best efforts, *Nolasco* does not support the failure of the BIA and IJ to discuss any contradictory evidence in the record. Rather, *Nolasco* emphasizes this Court's requirement that IJs and the BIA must consider at least some country conditions evidence when provided. *Id*. at 191 ("The agency abuses its discretion when it arbitrarily ignores 'legally significant evidence.'" (citing *Rodriguez-Arias*, 915 F.3d at 974)); *see also Chen*, 72 F.4th at 573. In *Nolasco*, the agency properly engaged with the facts, and we left the decision below undisturbed. However, the failure to consider any country conditions evidence here requires vacatur.

The majority's rubber stamp of the almost nonexistent discussion of the country conditions evidence in this case flies in the face of this Court's precedents, in which we have emphasized that when "contradictory evidence is strong enough," an agency must "account for it in a meaningful way." *Ai Hua Chen*, 742 F.3d at 181; *see also Orellana*, 925 F.3d at 152 (explaining that to "arbitrarily ignore . . . unrebutted, legally significant evidence and focus only on the isolated instances where police did respond constitutes an abuse of discretion.") (cleaned up). The majority is correct the BIA and IJ did not necessarily "ignore" the existence of counterevidence, Majority Op. at 18, as both opinions

27

did acknowledge the existence of evidence that did not support their conclusion. However, neither discussed that evidence in any respect, not even stating what the evidence consisted of. This Court has never allowed agencies to avoid review with a one-sentence summary rejection of all counterevidence, and, in my view, the line between the BIA's rejection of the country conditions evidence here and completely ignoring that evidence is quite thin. I cannot join the majority in breaking this new and dangerous ground in the review of agency adjudication.

## IV.

The failure of any immigration authority to mention even a single piece of country conditions evidence—let alone to meaningfully engage with this evidence—compels remand for the BIA to evaluate the strong evidence presented in this case.[*] If allowed to stand, the majority's opinion would dramatically curtail the scope of our already limited review of immigration adjudication. Therefore, I respectfully dissent.

---

[*] Because the majority does not reach the question of Bryan's nexus argument or the portions of his ineffective assistance claim beyond willingness and ability to control, I do not discuss these issues herein. However, I would grant the Petition based on Bryan's ability to show prejudice from the failure to file an application on Cony's behalf.

28